John P. Kirby, Administrator, Appellee, v. Chicago, Rock
Island & Pacific Railway Company, Appellant.

**MASTER AND SERVANT:** Actions—Evidence—Negligence in Mat-
1   ters Generally. On the issue whether a locomotive engine ex-
ploded because of its faulty design and construction, and de-
fendant's responsibility therefor, evidence that the railway was
negligent generally in the handling, care and firing of its engines,
other than the one in question, is wholly incompetent.

**WITNESSES:** Cross-examination—Allowable Scope. Cross-exami-
2   nation must be confined to facts connected with the direct ex-
amination. Therefore, on the question of the cause of an ex-
plosion of a locomotive engine, *held* that testimony that three
other engines, out of something like ninety of the same general
type as the one in question, had exploded prior to the explosion
in question, was improperly brought out on cross-examination of
defendant's witnesses, such witnesses having said nothing in
chief justifying such line of inquiry on cross-examination.

**MASTER AND SERVANT:** Actions—Evidence—Fact of Explosion.
3   The testimony of a nonexpert witness, which shows nothing but
the location and position of the broken parts of an engine after
a wreck, is wholly insufficient to prove that the wreck was caused
by an explosion of the engine.

**MASTER AND SERVANT:** Actions—Evidence—Other Similar Ex-
4   plosions. Evidence of the explosions of locomotive engines other
than the engine in question, for the purpose of establishing the
inference that the engine in question was of faulty design and
construction, are admissible only (a) when the types of engines
are substantially alike, (b) when the explosions occurred under
substantially similar conditions of operation, and (c) when,
as a general rule, such explosions appear to have been of such
frequency as to lead the mind to the conclusion that the engines,

as a class, were of faulty design and construction. *Held*, evidence of other explosions was improperly admitted under this rule.

**APPEAL AND ERROR:** Subsequent Appeal—Law of Case—Duty of Court to Follow. The law as to any point in the case, as declared by the court on appeal, is binding on the court on retrial on the same record. So held where on appeal, the court held that the location of a gauge cock was not in any manner the cause of the explosion of a boiler.

**EVIDENCE:** Opinion Evidence—Hypothetical Question—Proper and Improper Form. A hypothetical question must be so framed as to prevent the expert witness from passing on the ultimate question before the jury—a rule with but few exceptions, and a rule which reflects the reluctance of the law to wider open the door to a class of evidence receivable on the plea of necessity only. This rule prevents the expert from going further than to state what *might* or *may* have or *probably* did cause a certain result or condition— a companion rule which insures due latitude and standing to the opinion of the expert and still usurps no duty of the jury.

PRINCIPLE APPLIED: Plaintiff claimed that the explosion of the boiler of a locomotive engine was caused by certain speci- fied faults in the design and construction of the boiler. Defendant claimed that the explosion was caused by the negligence of the engineer in allowing the water to drop below the "crown sheet" of the boiler. Plaintiff's hypothetical question embodied a state- ment of the facts alleged to be established in the evidence, the form of the question being: "Assuming the foregoing to be the facts, what, in your opinion, *was the cause or causes* that produced the explosion?"

1. *Held*, the question was improper in form.
2. *Held*, the following forms would have been proper:

(a) Assuming the foregoing to be the facts, what, in your opinion, *might have been* the cause or causes of the explosion?

(b) Assuming the foregoing to be the facts, what, in your opinion, was the *probable* cause of the explosion?

(c) Assuming the foregoing to be the facts, *might* the cause of the explosion have been (specifying any certain structural feature of which complaint was made)?

**EVIDENCE:** Opinion Evidence—Hypothetical Question—Inclusion and Exclusion of Facts. A hypothetical question which embodies substantially all the facts relied upon by the party asking the question, and proved by him down to the time the question is asked, is not rendered incompetent because, in the later stages of the trial, other facts are developed by the opposing party, which facts, had they been known at the time the question was asked,

*might* have been included therein. A party has the right to make his own case.

**MASTER AND SERVANT: Rules—Disobedience to—Effect.** Dis-
8  obedience of the servant to a reasonable rule, made by the master for the mutual protection of both master and servant and known to the servant, resulting in or contributing to an injury to the servant, precludes the servant from all recovery. This rule must not be confused with the rule that, as between *third parties* and the master, negligence cannot be predicated solely upon the violation of a rule by the servant.

**DEATH: Damages—"Present Worth"—Right to Specific Instruc-
9  tion.** *On request*, the defendant, in an action for damages for wrongful death, is entitled to a specific instruction that the term "actual pecuniary loss to the estate" means the *present worth* of the decedent's life to his estate at the time of his death, and that the jury should take into consideration that the sum of money, if any, received by the estate is received *now* instead of at the end of the probable expectancy of life of the deceased.

**MASTER AND SERVANT: Tools, Machinery and Appliances—De-
10  signing Locomotive Engine—Approving Plans—Effect.** A master who draws in whole or in part the design for a locomotive engine and approves the plans therefor and causes the same to be constructed by a manufacturer is held to the same care as if he had constructed the engine in his own shops.

*Appeal from Linn District Court.*—W. N. TREICHLER, Judge.

THURSDAY, DECEMBER 16, 1915.

ACTION at law to recover damages for the death of William J. Kirby, due to the explosion of the boiler of a steam locomotive upon which he (Kirby) was an engineer. Defendant denied the negligence charged and pleaded contributory negligence of the deceased. Upon the issues joined, the case was tried to a jury, resulting in a verdict and judgment for plaintiff in the sum of $10,000, and defendant appeals.—*Reversed.*

*Grimm & Trewin, F. W. Sargent* and *Robert J. Bannister,* for appellant.

*Dawley, Jordan & Dawley,* for appellee.

DEEMER, C. J.—The case was before us on appeal from

a judgment for defendant, the opinion being found in 150
Iowa, 587. On that appeal, it was held that there was no
sufficient showing that the location of the gauge cocks on the
locomotive was the proximate cause of the explosion, and this
holding must be treated as the law of the case. Upon the
second trial, plaintiff relied upon the charge that the defend-
ant was negligent in that the boiler was improperly con-
structed, in that: (1) The stay bolts were too short and
improperly placed; the water legs had not sufficient water
space and the mud rings were too small and were defective;
and, (2) that the fire box was too large for the water space
provided around it.

These defects are said to have been the proximate cause
of the accident. Much of the testimony is technical in char-
acter and has to do largely with the construction and arrange-
ment of the boiler and fire box of the locomotive. Many of
the facts are not in dispute. It is agreed that the deceased
was a locomotive engineer, something like 32 years of age,
who had been in defendant's employ for some six or seven
years, a little over two years of that time as a locomotive
engineer. He had no regular engine and was subject to call
for special service. On the day of the accident, to wit, Janu-
ary 30, 1905, he was called to take an engine and special train
from Cedar Rapids southward to and through the town of
Solon. The engine was known as No. 1422. The train was a
special one, due to leave Cedar Rapids at about 7:15 P. M.,
and the engine had been in service the same day, having
brought into Cedar Rapids a train from the north, arriving
at about 10:30 or 11 o'clock A. M. The engineer who brought
the locomotive into Cedar Rapids testified that, when he
turned it over to the hostler, it was in good condition and that
everything was in good working order; that there were no
leaks anywhere; and that "she popped off" all right. He said,
also, that the steam gauges, safety valves, injectors, water
glass and gauge cock were all in good condition and in good
working order. The hostler who took the engine and turned

the same over to Kirby testified that, when he placed the same on the track where Kirby took it, the water glass was in good working order, the boiler was properly filled with water and the engine properly supplied for its run.   It also appears that when the engine came in from its trip the day before, a few of the flues were leaking, which, according to the testimony, was not an unusual occurrence, and that these leaks were all stopped by calking and that, after these repairs were made, the engine was in good condition.   The defendant also offered, and there were received in evidence, the following rules of the company:

"Before going out on the road they must have a copy of the rules and regulations and the latest time table and a full set of signals and all necessary tools and implements for use in case of accident.   They must examine the bulletin book and be fully informed as to all notices posted for their guidance. They must also have their engines in good working order, supplied with fuel and water, ready to attach to the train at least thirty minutes before leaving time, or as much more as may be necessary, and they must observe the state of the weather, the condition of the rails, and the length of the train, and they must compare their time with the conductor's before starting to leave on their trip.   He must report for duty at the appointed time, see that the engine is in good working order and furnished with supplies, give a check for fuel and stores received, and assist in shifting and making up the train when required."

In this connection, it is contended that the deceased either did his duty by complying with these rules and found that everything about the engine was in good working order, or that his neglect in so doing was his own negligence, and that if, as a result thereof, the boiler exploded, no recovery can be had for his estate.

Passing this point for the present, the affirmative testimony shows that the hostler properly supplied the engine with fuel and water, saw that the water was at a proper stage in

the boiler and the fire in proper condition when he turned the engine over to Kirby. Kirby did not immediately take her out, for the reason that the train which he was to take was late; but during all this delay, Kirby was in charge of the engine. The train to which the engine was attached consisted of 17 cars and a way car. Eight only of these were loaded, the others being empty. It was lighter than the ordinary train, and was what was called "half tonnage".

The train started on its journey southward about 7:15 P. M. and made its first stop within the city limits of the city of Cedar Rapids, to pick up some stockmen. Again, it stopped for a crossing on Ninth Avenue in said city, and then ran south, something like 13 miles, to within a distance of a mile or more from the town of Solon, when the boiler suddenly exploded, killing the engineer, fireman and the head brakeman, who was also on the engine. At the time of the explosion, the train was running on a down grade at the rate of approximately 30 miles an hour; and as a result thereof, the engine and tender and practically the entire train were derailed and suddenly stopped. So far as known, the explosion was without warning to anyone and was extremely violent in character. The explosion was in the fire box, and what is called the crown sheet was dismembered and twisted out of shape. Some of the stay rods or tie bolts were broken and the holes through which these bolts passed were somewhat elongated. What is called the flue sheet was also broken down, especially at the top thereof. Plaintiff contends that the explosion was due to the faulty design and construction of the engine and boiler; especially that part of it making the fire box, in that the water space around that part of the boiler making the fire box was too small, the mud rings which go entirely around the fire box and constitute the base of the boiler at that point too narrow, and the two sheets which constitute what are called the legs of the boiler, and those at top, the bottom of which is known as the crown sheet, were not properly bolted together and stayed and were inadequate

in size, resulting in an insufficient water column immediately surrounding the fire to give the necessary radiating surface; and that, as a result, the fire was not properly blanketed and the steam formed so quickly and the circulation of the water through the boiler was so poor that the sheets exposed to the fire became overheated, lost their tensile strength and finally gave way. Defendant denied that the engine was deficient either in construction or design; pleaded that, even if it were, defendant exercised all the care required of it in the selection of the design, and that the explosion was either accidental and without fault on its part or that it was due to the engineer's failure to keep the water at a proper stage in the boiler, allowing it to get below the bottom of the crown sheet, thus exposing this thin piece of steel to the great heat of the fire,— thus bringing about the explosion. It is around these issues that the contest centers. The engine was what was known as the 1400 type. It was purchased by the defendant in the year 1901 from the Brooks Locomotive Works, a company controlled by the American Locomotive Company. It was not what might be called a standard type and it does not appear who designed it; but it was built specially for the defendant company, upon plans and specifications approved by the defendant's engineers, in co-operation with the builder's engineers. It was a very large engine for that time and was of the high pressure type, although not built for speed, as it was a freight and not a passenger engine. It was immediately put into service by the defendant company and ran without substantial repairs until October of the year 1904, when it was thoroughly overhauled and repaired. From that time until it exploded, it ran in various directions out of Cedar Rapids, and, after the explosion, it was repaired so as to make it substantially the same in design as before and has since been in use by the company. Plaintiff concedes that the only issue in the case is whether or not the boiler was faulty in its general design and construction and that he had the burden of proving the affirmative of that issue. This he

attempted to meet by showing the plan, design and method of construction from blue prints corroborated by testimony from witnesses as to the actual appearance of the boiler and its equipment, and this he followed up by expert testimony tending to show that the design was bad and not such as to be approved by skilled workmen, and further, had a witness or witnesses give their opinions from hypothetical questions as to the cause of the explosion. Plaintiff's main witness, in response to a long hypothetical question, over defendant's objection, said:

A. "Assuming the facts stated in the question to be true, it is my opinion that the explosion was probably caused by a defective design in the locomotive boiler, especially in the fire box and the stays and radial stays supporting it, and also by the excessive stresses which had come upon portions of the boiler in its regular and usual service which, in all probability, or which probably were increased by the lime in the water with which the boiler was supplied, and by defects in the design, and also perhaps by the fact that the water over the crown sheet might have become too low because of the location of the gauge cocks too near the level of the top of the crown sheet, thus deceiving the engineer in causing him to believe that he had more water over the crown sheet that he actually had, and further, by the facts that the engine had recently, a short time before the explosion, been running up and down grade, thus causing the water to pile first at one end of the boiler and then at the other end." Q. "Mr. Williston, without repeating the last question, but assuming the facts as therein stated are true, you may·state whether in your opinion and judgment such an explosion could have occurred even though the crown sheet were covered with water." A. "Yes; it might have." Q. "Now, would it be possible to have a large fire box of this size in boilers of any size or kind that would obviate these dangers to a large extent, and if so, how? I will change the wording from possible to practicable." A. "It would, provided the shell was sufficiently large to allow

room sufficient between the fire box and the shell for a free circulation of water, and for expansion between the fire box and the shell. Fire boxes as large as that one are in use generally in larger shells. . . . My answer is partially based upon what I conceive to be the faulty design of the engine."

Another witness, by the name of Fawcett, whose competency is challenged, testified over defendant's objection as follows:

"This boiler and fire box shown in Exhibit 'A' contains a large heating surface. I would consider the water capacity small as compared with the heating surface in this boiler." Q. "What fault, if any, did you find with the method of staying?" A. "The stay bolts are not all of them placed directly to coincide with the lines of force, or in other words, the radial center of pressure. It establishes unequal strains between the crown sheet and the shell of the boiler, transverse strains instead of direct strains." Q. "What effect would that have in the course of time upon the crown sheet and the side sheets?" A. "It would have a tendency to loosen the stay bolts and weaken the sheets." Q. "What is your opinion concerning the width of the water space in the leg, which, I believe, is 3½ inches?" A. "Three and one-half inches would be, in my opinion, considerably less than would be good practice." Q. "Why?" A. "The small space between the inner and outer shell would be so much by the steaming process under high heat." Q. "What effect would that have upon the circulation of the water?" A. "It would retard the circulation very materially." Q. "Now what would you say as to whether a gauge cock, where the lowest gauge cock is 2½ inches above the top of the highest point of the crown sheet, whether that would be a proper and safe way to have it located?" A. "I would consider it entirely too small for locomotive practice."

Expert witnesses for defendant, some of whom examined the wreck after the accident, and others who heard a descrip-

tion thereof, testified just as positively, and even with more assurance, that the explosion was due to the fact that the water in the boiler got below the bottom of the crown sheet; that the fire caused this crown sheet to buckle and finally to burst, leaving it to be inferred that the engineer was remiss in his duty in not keeping the water at the proper stage in the boiler. The jury evidently found that the explosion was due to the faulty design and construction of the boiler and that defendant was responsible therefor. Several errors are assigned, and we shall give our attention to those which are considered important and controlling.

I. Plaintiff was permitted to show, over defendant's objections, that, during the latter part of the year 1904 and the fore part of the year 1905, defendant's agents and servants left hot engines standing upon sidetracks for from half to three quarters of a day at a time, with steam on and without anyone attending to them. There was no pretense that the engine in question was one so left; indeed, the number of the engines given by the witness clearly indicated that the one which exploded was not one of them. Again, this witness was permitted to testify as follows, over defendant's objections:

1. MASTER AND SERVANT: actions: evidence: negligence in matters generally.

Q. "Now, what, if anything, have you observed during that winter, the winter of 1904 and 1905, about fireboxes that had been burned so that they had the blue color and were being sent out on the road again without being fixed?" A. "As to the color, I couldn't say, but I have seen engines from the time that I first went to work for the Rock Island Company that was burned, mud burned, and sagged in the crown sheet. Some was fixed up so that they didn't leak and some of them wasn't." Q. "During that winter it was the custom to send such engines as that out on the road if they were not burned too bad, was it?" A. "They were short on power and the engines were used without being repaired. I could tell the crown sheets of those fireboxes had been burned

because they generally showed a little pocket where they had been burned and some of them would have a sag in like that."

This witness concluded his testimony on cross-examination by saying:

Q. "Now, tell us of one engine, just one engine, that you saw there prior to Jan., 1905, that you knew stood there for half a day without attention?" A. "Well, I couldn't say positive as to any engine." Q. "Tell us some time you saw one." A. "I couldn't say that I could before that date." Q. "So that now you say that you do not know that you saw— you are not prepared to say that you saw any engine there prior to Jan. 30, 1905, that stood on that track for half a day without attention?" A. "No, I don't know that I could. I didn't mean to say that I saw engines standing on there prior to Jan. 30, 1905, without attention. I don't know anything about the custom in that respect prior to Jan. 30, 1905."

Defendant also moved to strike this witness's entire testi-mony, but the motion was overruled. It is manifest that this testimony should have been excluded. There is no claim that the engine in question was the one to which the witness had reference, and proof of a negligent custom with other engines, even if shown, would not be admissible. Appellee's counsel do not favor us with any argument in support of the rulings of the trial court, doubtless for the reason that none occurs to them at this time.

II. Plaintiff undertook by cross-examination to show, by certain of defendant's witnesses and by original testimony from some of his own, that three other engines, out of some-

2. WITNESSES: cross-examina-tion: allowable scope.

thing like ninety of the same general type as the one in question, exploded prior to the time of the accident which caused the death of plaintiff's intestate. The testimony brought out on cross-examination was manifestly not proper; for the witnesses had said nothing in chief which justified such a line of inquiry on cross-examination. The most that can be claimed is that, in

so far as this testimony is concerned, plaintiff made the witnesses his own. The original testimony as to one of the explosions came from a nonexpert witness, a lawyer who went to the scene of the wreck on defendant's line near Victor in this state, shortly after the wreck occurred. This witness testified in part as follows:

3. MASTER AND servant: actions: evidence: fact of explosion.

Q. "Do you know what caused the wreck?" A. "I know nothing. except what I heard." Q. "What did you observe, if anything, as to whether 1413 had exploded, blown up?" A. "When I came up there it was possibly pretty close to seven o'clock in the morning—I walked up the track and saw some of the coaches were still on the track, some were not on the rails. but were on the right of way. The baggage and smoker, if I remember right, had rolled completely down the embankment and were lying upside down." Q. "I am calling particularly for what you observed as to whether or not the engine had exploded—the boiler of the engine. Explain what you saw as to the condition of the boiler." A. "The boiler was lying—the trucks were on the track, on the right of way, at least—the boiler was lying north of the track, down the embankment and either close to or over the right of way fence, and close to where the end of the boiler was lying there was a depression in the ground sunk probably from a foot to a foot and a half or two feet through the frozen ground and approximately the size of the end of the boiler." Q. "What else did you observe, if anything, as to whether the fire box and the boiler, the box that they have the fire in, was blown out or blown up, or what was the condition of that? Did you observe as to that fire box?" A. "The fire box was broken. I could not testify as to the exact condition of it. I haven't any specific recollections as to its exact condition, except that it was broken." Q. "Have you any recollection as to the rear end of the locomotive—the part that goes over the fire box, over the door where the coal is put in? If you have,

state what you observed as to whether that was blown out or broken open, or what its condition was." A. "Part of the rear end was blown out, and was lying up in front of where the tender was standing. I don't know how it got there. I am not an expert."

In addition to objecting to the testimony as it was offered, defendant moved to strike it from the record after it was received, but the objection and the motion were overruled. This was erroneous. There is no showing that the condition of the engine was due primarily to an explosion. Its condition, as it appeared to this witness, might have resulted from a derailment or from many other causes than defective design or construction.

Another of plaintiff's witnesses testified to the explosion of a boiler in another engine at Davenport some time before the accident in question. This witness said that the two engines were of the same general type of construction; but, on cross-examination, he said that the explosion at Davenport was due to low water in the boiler; that the water had gotten down to four inches below the bottom of the crown sheet, so that the crown sheet was entirely bare. This witness also said that this was the frequent cause of boiler explosions. Defendant at least twice moved to exclude this testimony, but its motions were overruled. We think that they should have been sustained. Testimony as to other explosions of engines of similar type, if admissible at all, can only be received upon a showing that the types of engines were substantially alike; that the explosions occurred under similar conditions of operation and with such frequency as to lead the mind to the conclusion that the engines as a class were of faulty design and construction. This was not shown in the instant case. According to plaintiff's own theory, the accident may have been due to the failure of the engineer to keep the water in the boiler at a proper stage, to failure of the company to repair, or to many other causes than faulty design

4. MASTER AND SERVANT: actions: evidence: other similar explosions.

or construction. Indeed, the last witness testified that the explosion of the engine at Davenport was due to the fact that the operator allowed the water to get too low,—so low that the crown sheet was exposed to the heat in the fire box without any water protection. As a rule, testimony as to similar explosions is inadmissible for the purpose of showing negligence. If the appliances or devices were of the same general type, and so constructed and operated that no harm could befall save that they were of faulty design or construction, doubtless the explosion or bursting of one under conditions similar to those attending the operation of another might be given probative force. But the universal rule is that the conditions and circumstances must be substantially the same in each instance. *City of Bloomington v. Legg*, (Ill.) 37 N. E 696; *Konold v. Rio Grande W. R. Co.*, (Utah) 60 Pac. 1021; *Union P. R. Co. v. O'Brien*, 161 U. S. 451; *Western U. Tel. Co. v. Levi*, 47 Ind. 552; *Bach v. Iowa C. R. Co.*, 112 Iowa 241; *Campbell v. Russell*, (Mass.) 1 N. E. 345; *Wilkins v. Omaha & C. B. R. Co.*, 96 Iowa 668; *C. St. L. & P. R. Co. v. Champion*, (Ind.) 36 N. E. 221, 222; *Strong v. Armour & Co.*, 154 Ill. App. 649; *Osborne & Co. v. Simmerson*, 73 Iowa 509. We are clearly of opinion that the court erred in the respects mentioned. Moreover, the effect of such testimony in general, when similarity of circumstances and condition is shown, depends largely upon the number of prior similar instances, although this is not always a sure test as to the admissibility of testimony of the prior accidents. See Wigmore, Evidence, Sec. 447, and cases cited.

III. Evidence was adduced as to the location of the gauge cock and water glass upon the engine. This was doubtless admissible as explanatory of the construction of the engine; but the trial court refused an instruc-

5. APPEAL AND
ERROR: subsequent appeal:
law of case:
duty of court
to follow.

tion offered by defendant to the effect that the location of the lower gauge cock should not be considered by the jury, for the reason that there was no evidence that this was the proximate cause

of the explosion. On the former appeal, this proposition was decided in accord with the instruction asked, and that instruction should have been given. See the case as reported in 150 Iowa 587.

IV. The form of the questions put to plaintiff's expert witnesses was: "Now, assuming the foregoing to be the facts, what, in your judgment, was the cause or causes that produced that explosion?" There is a decided conflict in the cases upon the correctness of this form of interrogatory. The general rule prevailing in this state is to the effect that such a question is not proper, for it permits the witness to decide the whole case and leaves nothing for the jury to do except to believe or disbelieve the witness and render its verdict accordingly. *Martin v. Des Moines Edison Light Co.,* 131 Iowa 724-739; *Sever v. Minneapolis & St. L. R. Co.,* 156 Iowa 664; *Sachra v. Town of Manilla,* 120 Iowa 562-567; *State v. Bennett,* 143 Iowa 214-217, and cases cited. This is the rule in many other states. *Briggs v. Minneapolis St. Railway Co.,* 53 N. W. 1019; *Wilson v. Reedy,* (Minn.) 24 N. W. 191; *Gross v. Omaha & C. B. St. R. Co.,* (Neb.) 147 N. W. 1121. The proper form of question is to ask what was the probable cause of the explosion, or what might or might not have caused it. Plaintiff's main witness left the matter in some doubt, by saying that it might have been caused by defects in the design which he pointed out, and perhaps by the fact that the water had been permitted to get too low over the crown sheet. But he finally concluded that the explosion might have happened even had the crown sheet been covered with water. Recurring again to the rule applicable to the examination of experts, it should be said that we have relaxed it somewhat when the question arises as to the cause of the death of a human being. *State v. Hessenius,* 165 Iowa 415. Some other exceptions have been made, as in *Searles v. Northwestern Mutual Life Ins. Co.,* 148 Iowa 65. We are not pre-

6. EVIDENCE: opinion evidence: hypothetical question: proper and improper form.

pared at this time to enlarge these exceptions so as to approve the form of examination used on this trial.

V. Complaint is made of the hypothetical questions propounded to plaintiff's expert witnesses, because they did not include all the facts shown in evidence. It is true that they did not include the facts as testified to by defendant's witnesses, but they did embody all, or substantially all, the facts relied upon by plaintiff and proved by him down to the time the experts were placed upon the witness stand. The testimony of these witnesses was not rendered incompetent because the hypothetical question did not assume all the facts proved upon the trial. Plaintiff had the right to make his own case and was not compelled to withhold his experts until he saw what defendant might develop upon the trial. The testimony introduced by defendant might entirely destroy plaintiff's case or render his experts' opinions of no value because not based upon the material facts as shown by the record, but this would be no reason for excluding their testimony when offered.

7. EVIDENCE: opinion evidence: hypothetical question: inclusion and exclusion of facts.

Again, it is said that some of plaintiff's experts did not sufficiently qualify themselves to give professional opinions. All of them showed some familiarity with boiler construction, and the weight of their testimony was for the jury.

VI. Among other instructions, the trial court gave the following:

"Certain rules and regulations of the defendant company have been introduced in evidence, and you are instructed that if you find that such rules came to the notice of William J. Kirby during his employment with the railway company, or in the exercise of ordinary care, he should have known of such rules, then you may consider such rules so far as they bear directly on the duty of the engineers to perform the work customarily exacted of them before starting

8. MASTER AND SERVANT: rules: disobedience to: effect.

out with an engine, in ascertaining that the engine has sufficient water in the boiler and that the water gauges and water glass were in working order; but the rules of the railway company cannot change its liability to its engineers, nor fix a legal standard of care, or any different degree of care or risk than the law assumes; that is, the ordinary degree of diligence or care on the part of the engineer, considering all the circumstances of the case.''

This instruction was manifestly erroneous. It had reference to the rules heretofore quoted in this opinion,—rules which prescribed deceased's duty in the premises, made for his own as well as for the employer's protection. They were reasonable in character and had reference to the duties of the deceased with reference to the management of his engine. If he disobeyed them and through his disobedience he caused or contributed towards bringing about the accident, he cannot recover. *Deeds v. Chicago, R. I. & P. R. Co.,* 74 Iowa 154; Labatt on Master and Servant, Vol. 3, p. 3581, Sec. 1281.

VII. The instruction as to the measure of damages was not as full as it should have been, and defendant was entitled to have the one it asked given. The difficulty here lies in the fact that the jury was not fully instructed as to how to estimate the present worth of one's life to his estate, had he lived out his expectancy.

9. DEATH: damages: "present worth": right to specific instruction.

VIII. In a reply argument, it is vigorously contended that there is no testimony to justify a verdict for the plaintiff. In view of a new trial, it is better, perhaps, that we do no more at this time than meet one of the premises of this argument. That premise is that the case presents no different aspect than had the defendant company gone into the open market and purchased a standard type of engine from a reliable manufacturer, without knowledge of any defects therein, either in design or construction. As we understand the record, this premise is not

10. MASTER AND SERVANT: tools, machinery and appliances: designing locomotive engine: approving plans: effect.

correct. The defendant's engineers either designed or had a part in designing the engine. They approved the plans thereof, and the engine was built according to these plans. The case differs, then, in no substantial respect from one where a railway company builds and constructs its own engines, and the same care was required of it as if it had constructed the same in its own shops and according to its own plans.

For the errors pointed out, the judgment must be, and it is—*Reversed.*

WEAVER, EVANS and PRESTON, JJ., concur.