L. W. RUSSELL et al., Appellees, v. CHICAGO, MILWAUKEE &
SAINT PAUL RAILWAY COMPANY, Appellant.

**RAILROADS:  Fires—Evidence—Sufficiency.**  Evidence reviewed, and
1  held sufficient to sustain a finding that the fire in question was set
out by a passing engine.

**EVIDENCE:  Similar Facts and Transactions—Sparks From Engines.**
2  Testimony tending to show that sparks from railway engines gen-
erally had been carried to a named distance is admissible without
any showing of *similarity of conditions* between the engines emitting
such sparks and the engine which is alleged to have caused the dam-
ages in question, when such testimony is offered in rebuttal to meet
the broad claim in the evidence that sparks would never, under *any
conditions,* be carried to such distance.

**INSURANCE:  Subrogation—Common Carrier Causing Loss.**  An in-
3  surer who pays the loss of the insured is presumptively not a mere
volunteer, and such insurer is by such payment subrogated to the
rights of the insured against a third person whose wrongful act
primarily caused the loss.

**APPEAL AND ERROR:  Review—Mending Hold on Appeal.**  A liti-
4  gant may not try his cause in the trial court on one theory and in
the appellate court on a different theory.  So held where a common
carrier assumed in the trial court that it had the burden to show
freedom from negligence, but contended to the contrary on appeal.

*Appeal from Jones District Court.*—F. L. ANDERSON, Judge.

FEBRUARY 6, 1923.

REHEARING DENIED MAY 12, 1923.

ACTION brought by the owner and certain insurance com-
panies, to recover the value of a livery stock destroyed by fire,
it being claimed that the fire was set out by one of the locomo-
tives of the defendant railway company.  Trial to a jury.  Ver-
dict for plaintiffs for $4,500.  After the verdict, the court
apportioned the amount of the recovery among the plaintiffs,
and entered judgment against defendant in favor of the plain-
tiff Home Insurance Company in the sum of $1,748.45; in favor

of the plaintiff Hartford Fire Insurance Company in the sum of $1,000; in favor of the plaintiff North British & Mercantile Insurance Company in the sum of $616.25; and in favor of the plaintiff Russell, the owner, in the sum of $1,135.30. The several amounts so entered in favor of the insurance companies were the sums paid Russell by them, under settlements made by the insurance companies because of fire insurance policies covering the property, which they had paid to Russell, the owner, as insured. The defendant appeals.—*Affirmed.*

*Hughes, Taylor & O'Brien* and *B. E. Rhinehart,* for appellant.

*C. J. Cash* and *Bates, Hicks & Folonie,* for appellees.

PRESTON, C. J.—In addition to the matters before referred to, it was alleged in general terms that, through negligence on the part of defendant in the operation of a locomotive through the city of Anamosa, sparks and live coals were permitted to escape, which set fire to the property and destroyed it; that the insurance companies are subrogated to Russell's rights against defendant to the extent of the settlements; that Russell's loss above the amounts received from the insurance companies was more than $4,000.

Answering, defendant denied generally, and alleged that the engine operated by defendant was operated with due care, and equipped with the best known apparatus to prevent the escape of sparks and fire, and that said apparatus was in perfect condition.

The only evidence offered by defendant on the issues raised by the general denial was affirmative testimony as to the proper equipment of the engine and its proper operation. The issues raised by the denial were as to the cause of the fire and the sufficiency of the evidence to show that the fire originated from the engine of the defendant. No other questions of fact were at issue. A question of law was raised as to the right of insurance companies which claimed that they had been subrogated by payment of the loss in part. Defendant offered no evidence on the general denial as to the fact of the fire, nor as to the amount of

the loss, and there was no testimony except that offered by plaintiff as to the cause of the fire.

1. The first error assigned is the refusal of the court to direct a verdict in favor of defendant on the ground that the plaintiffs failed to prove that the fire was set out by defendant's locomotive. Another of the errors may be considered with this one. It is that plaintiffs failed to show that defendant was negligent in the operation of its locomotive, and that, therefore, the court erred in overruling the defendant's motion on that ground.

1. RAILROADS: fires: evidence: sufficiency.

The barn and its contents were destroyed by fire on the evening of May 18, 1917. The building was not owned by the occupant, Russell. It was on the east side of Huber Street, which extends north and south, the barn facing west. Some distance south of the barn was defendant's railroad sidetrack, and next south of this track was the freight depot. The main track was south of the freight depot, and extended through Anamosa in a generally east and west direction, turning slightly to the north and nearer to the livery barn, as it proceeded west from the passenger depot, which was located one block east of Huber Street. The southwest corner of the barn was 126 feet north of the center of the main track, and the southeast corner of the barn was 142 feet north of the center of the main track. The size of the barn was 68x90 feet, the long way extending east and west. The part of the barn next to the street was used for vehicles and an office, and the rear or east part of the barn was used as a horse barn. The front of the barn was one story, but over the horse barn was a haymow. Defendant's passenger train left Anamosa at 7:22 P. M. on the date in question, proceeding westward along the main track before described. There is a slight up-grade from the passenger station to the freight house. There is evidence that the engine of the passenger train was working hard in starting the train, as it left the passenger station, and sparks were seen coming from the smokestack as it passed the freight house. There was a breeze from the southeast at the time of the fire. Within a few minutes after the time the train left, the barn was discovered in flames, and the alarm was given. The sun set at 7:16, and the fire was at about 7:30. It

was still daylight at the time of the fire. The barn was wired
for electricity, and that was the method of lighting it; but there
were no lights turned on in the barn, and no fire burning in
any stove, and no person near the barn, except two men sitting
outside, when the fire started. Plaintiffs' evidence tends to
show that the fire was first seen on the top of the barn, before
the fire alarm was given. From the testimony of defendant's
witness Brown, defendant contends that the fire was first seen
in the lower part of the barn, in the part where the horses were
kept. This witness was sitting on the porch of a hotel on Davis
Street, and went only about halfway over to the fire. He says
that, when he first saw the barn, he didn't think it was afire;
that "it didn't look like it was anything more than an electric
light at that time, and then you could see there was a fire,—
that is, a blaze of some kind,—a reflection;" that that was on
the first floor, where the horses were; that he didn't see any fire
on the top of the barn until it burst out; that, when he first saw
the fire, he could see the reflection, but that he does not know
just where the fire was. There was no fire or light of any kind
in the barn, nor, so far as known, in adjoining buildings. The
sparks from the burning barn ignited another barn several hun-
dred feet to the northwest, and embers were carried some miles
to the northwest in the same direction as the sparks were seen
going towards the Russell barn. The evidence shows that the
engine of defendant was throwing sparks when it passed the
barn, a few minutes before the fire was discovered, and that the
wind was carrying the sparks toward the barn.

The foregoing is a brief summary of the testimony. It is
very clear that the court could not say, as a matter of law, that
the fire did not originate from the sparks from defendant's en-
gine. The jury could have found that it did so originate. This
being so, plaintiff made a case for the jury on the question of
negligence, and it was still a question for the jury, after the
defendant's evidence tending to show due care and proper opera-
tion had been introduced. Counsel for appellant state in argu-
ment that it is probably the rule in this state that the presump-
tion of negligence arising from a showing on the part of the
plaintiff that a railway company set out a fire has the effect
of substantive evidence, and is enough to create a conflict for the

determination of a jury on the question of the railway company's negligence; and that, in view of this rule of law, they will not take the time of the court in arguing that the defendant was entitled to a directed verdict on that ground.  The instructions are not challenged.  There was no error in overruling the motion to direct a verdict on these grounds.

2.  It is claimed that the court permitted the introduction of evidence of witnesses who testified, over objection, to having seen sparks from a locomotive on other occasions and under different circumstances.  Appellant cites *Wilkins v. Omaha & C. B. R. & B. Co.*, 96 Iowa 668, where it was held substantially that, without proof that cars on all lines are of the same character and operated under the same conditions, it cannot be shown how far a car could be heard on one line by testimony as to how far cars could be heard on another.  The rule was again stated in *Kirby v. Chicago, R. I. & P. R. Co.*, 173 Iowa 144, 157, an explosion case, citing the *Wilkins* case, that, as a rule, testimony as to similar explosions is inadmissible for the purpose of showing negligence, and that the conditions and circumstances must be substantially the same in each instance.  It was also said that, if the appliances or devices were of the same general type, and so constructed and operated that no harm could befall unless they were of faulty design or construction, doubtless the explosion or bursting of one under conditions similar to those attending the operation of another might be given probative force.  In the instant case, two witnesses testified on this subject.  Reference to the evidence of one will be sufficient.  His evidence was:

2. Evidence: similar facts and transactions: sparks from engines.

"Q.  What observation, if any, have you made relative to an engine upon the evening passenger train, which, in 1917, within a reasonable time before and after May 18th of that year, departed from Anamosa around 7:06 to 7:22 P. M., at that time, relative to its throwing sparks or cinders?  A.  I have sat on the bench or stood in the barn in front of the office at the livery barn and seen live sparks fall as far north as the livery barn driveway and the office doors: that is, approximately 150 to 160 feet from the main line of the Milwaukee track."

It is contended that defendant had two engines so operating,

and that the evidence permitted was in reference to sparks at other times, and that it was not shown that it was the same engine, nor that the conditions were the same. But the evidence of these witnesses was introduced in rebuttal. A witness for defendant went back 20 years, and gave his experience and observation of engines generally. One of them says:

"I never knew of unusual holes in the netting, but I never saw one that was worn to speak of. An engine in good repair and properly handled by a competent engineer,—live sparks and cinders would not carry from it 125 feet and set anything afire. In my judgment, we could take the whole netting out, and sparks from the engine would not carry 125 feet and set fire."

Another witness testifying for defendant, who was formerly an engineer, but who had quit the railroad about 1900, testified:

"Sparks as a rule don't live very long after they leave the engine. We generally see them go out in the air, but they hardly ever come down alive."

He said that he was familiar with the front end of a railroad engine, and knew the device they were using to arrest the escape of sparks; that there is only one kind of a device that has been generally used; that the device shown in defendant's Exhibit B is the standard device used by railway companies for arresting the escape of sparks, "and in my opinion it is the best device known. Exhibit C is a sample of the standard mesh that is used by railroad companies in the spark arrester, and it is the same that has been used for the last 25 or 30 years, and is the standard that is used now. This front end is commonly used on all roads. This is the common screen that is used. No serious improvement in spark-arresting devices since I worked on the railroad. They are still using the same device. I think it is possible to set fire with an engine equipped with this spark arrester."

The plaintiffs' two rebuttal witnesses say that they had seen sparks travel a distance equal to that claimed in this case, and it is claimed by plaintiffs that this was from the same engine, operated by the same witness, on the same train, and under like conditions. As to the last, the evidence is not quite as strong, perhaps, as claimed. Plaintiffs, by the question, sought to confine the inquiry closely to the same time and to the same

train.  Defendant's evidence tended to show that all engines are
similarly equipped with screens.  The rebuttal evidence tended
to show that sparks would leave and would carry farther than
shown by defendant's witnesses.  In view of all the evidence
on this subject introduced by the defendant, we think the evi-
dence was competent in rebuttal.  *Budd v. Ann Arbor R. Co.,*
200 Mich. 250 (166 N. W. 927) ; *Hoskinson v. Central Vt. R. Co.,*
66 Vt. 618 (30 Atl. 24) ; *Matthews v. Missouri P. R. Co.,* 142 Mo.
645; *Dunning v. Maine C. R. Co.,* 91 Me. 87 ; *Grand Trunk R.
Co. v. Richardson,* 91 U. S. 454; *Cincinnati, N. O. & T. P. R.
Co. v. Winkle,* 148 Ky. 726; *Black v. Minneapolis & St. L. R.
Co.,* 122 Iowa 32.

3.  It is contended by appellant, as to the plaintiff insur-
ance companies, that, before they are entitled to subrogation,
they must show that they paid under compulsion some obligation

3. INSURANCE:
subrogation:
common carrier
causing loss.

for which the defendant was primarily respon-
sible; that the doctrine does not apply to a mere
stranger or volunteer; and that they must show
that they were not mere volunteers.  On this proposition they
cite Sheldon on Subrogation (2d Ed.), Sections 3, 11, and 240;
37 Cyc. 375; *Scandinavian Mut. Ins. Co. v. Chicago, B. & Q. R.
Co.,* 104 Neb. 258 (177 N. W. 178).  The plaintiff Russell testi-
fied that he received compensation from the insurance com-
panies in the amounts alleged by them.  It is true that it was
not shown in the evidence that Russell had given notices and
proofs of loss before the insurance companies paid Russell for
his loss.  But we have held that, in an action on a policy of
insurance containing a condition that notice of loss must be
given and proofs of loss furnished, as a condition to recovery
thereunder, in the absence of anything in defendant's answer
raising an issue as to the sufficiency of the notice and proofs
of loss, there was no necessity of introducing evidence as to the
contents of either.  *Hagan v. Merchants & Bankers Ins. Co.,* 81
Iowa 321.  We see no reason why the same principle should not
apply here.  The *Scandinavian Ins. Co.* case, above cited, was
decided upon demurrer.  It appeared that the plaintiff insur-
ance company, suing alone, had paid a claim for insurance where
the property destroyed was not covered by the policy, and there
was no legal or moral obligation to pay; and the court held

that the payment was purely voluntary. Appellees, conceding that the general rule is as stated in the other citations, cite *Hall & Long v. Railway Companies*, 13 Wall. (U. S.) 367, to the proposition that, whenever the insurance company has indemnified the owner for the loss, "he is entitled to all the means of indemnity which the satisfied owner held against the party primarily liable. * * * It is the doctrine of subrogation, dependent not at all upon privity of contract, but worked out through the right of the creditor or owner."

We find this doctrine stated in the books: The rule is well settled in fire insurance, as well as in marine insurance, that the insurer, upon paying to the assured the amount of a loss on the property insured, is subrogated in a corresponding amount to the assured's right of action against any person responsible for the loss; this right of the insurer against such other person not resting upon any relation of contract or of privity between them, but arising out of the nature of the contract of insurance as a contract of indemnity, derived from the assured alone, and enforcible in his right only. 25 Ruling Case Law 1372.

On payment of a loss, the insurer acquires the right to be subrogated *pro tanto* to any right of action which the insured may have against any third person whose wrongful act or negligence caused the loss. This right includes the subrogation of the insurer to any cause of action which the insured has against a carrier whose failure of duty caused the loss, as the carrier is primarily, and the insurer only secondarily, liable, and the insurer also is subrogated to the property owner's statutory right of recovery against a railroad company for setting out fire by the operation of its road. 14 Ruling Case Law 1404, citing numerous cases. We think this doctrine applicable to the situation in the instant case. Plaintiff Russell testified that his total loss was more than $5,000. The recovery was somewhat less than the amount claimed. It was in a lump sum of $4,500, and after the verdict, the court made the apportionment among the several plaintiffs, as before stated. The property destroyed was Russell's property. Under our statute, all persons having an interest in the subject of an action and obtaining the relief demanded may be joined as plaintiffs, except where otherwise

provided.  *Graves v. Merchants & Bankers Ins. Co.*, 82 Iowa 637.
If the defendant had any right to object to plaintiff's joining
with him other parties who claimed a right to the fund, it has
not done so.  The petition was not attacked in any way.

The defendant's liability for the loss of the property was
not increased by the fact that there was insurance on the prop-
erty, or by the fact that the insurance companies had paid the
plaintiff.  The plaintiff Russell is not objecting to the appor-
tionment among all the plaintiffs.  So far as this issue is con-
cerned, the answer of defendant was a general denial only.  There
is no question raised by the pleadings that the insurance com-
panies are not the real parties in interest to the extent of the
amounts paid by them, or that there is any misjoinder of parties,
and no plea in abatement.  There was no separate motion by de-
fendant to direct a verdict against the insurance companies.
The motion was all in one, and asked for a directed verdict
against all the plaintiffs.

4.  Some of the cases before cited have a bearing on the
further proposition argued by appellant that, under Section
2056 of the Code, the insurance companies as subrogees are not
subrogated to the remedial rules of evidence,
and that it was incumbent on them to show, not
only that the fire was set by defendant, but also
that it was set out through negligence on the part of the railway
company: in other words, that plaintiff Russell was required,
under the statute, to show only that the fire originated from
sparks from defendant's engine; but that the insurance com-
panies were required to go further, and to show, in addition
to that fact, that the company was negligent.  This would make
one rule of evidence for one plaintiff and another rule of evi-
dence for the other plaintiffs.  If there be any merit in this con-
tention, we think that appellant is not in a position to raise the
question now.  The concession before set out is broad enough
to cover all the plaintiffs.  Furthermore, plaintiffs alleged no
facts in the petition as specific grounds of negligence, and, as
said, the petition was not attacked.  The petition and answer
were drawn on the theory that the burden of proof was on the
defendant, to show that the engines were properly equipped.
Defendant alleged the facts as to equipment.  The theory of

4. APPEAL AND
ERROR: review:
mending hold
on appeal.

the answer was that, as to all plaintiffs, the burden of proving freedom from negligence was on the defendant. Having taken that position in the lower court, and having there assumed that the burden of proof was on defendant, it may not claim for the first time in this court that the burden does not rest upon it. *Benjamin v. Shea*, 83 Iowa 392. A party who has tried a case in the lower court on one theory may not mend his hold on appeal, and try it on another theory there, as where a petition stated a cause of action as for conversion, and the case was tried below on that theory, and on appeal recovery on a policy of insurance was attempted, as of a debt due and payable. *Himmelman v. Des Moines Ins. Co.*, 132 Iowa 668, 672; *Youngblood v. City of Mason City*, 165 Iowa 488, 496; *Board of Park Com. v. Taylor*, 133 Iowa 453.

No reversible error appearing in the record, the judgment is—*Affirmed.*

WEAVER, STEVENS, FAVILLE, and DE GRAFF, JJ., concur.