# Richmond

SOUTH HILL MOTOR COMPANY, INC., AND J. V. JONES v.
CHALMERS M. GORDON, JR.

January 9, 1939.

Record No. 1998.

Present, Campbell, C. J., and Holt, Gregory, Eggleston
and Spratley, JJ.

The opinion states the case.

*Parrish, Butcher & Parrish* and *Edward P. Simpkins, Jr.,* for the plaintiffs in error.

*Irby Turnbull,* for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

This case presents for our review a judgment in favor of a pedestrian, who was struck and injured by an automobile on a public highway.

Chalmers M. Gordon, Jr., was the plaintiff in the court below, and J. V. Jones, the operator of the automobile, and the South Hill Motor Company, Inc., his employer, were the

defendants. The parties will be hereinafter referred to according to the positions they occupied in the trial court.

The action was instituted by the filing of a declaration of trespass on the case. The defendants filed their plea of the general issue, grounds of defense, and a statement of their intention to rely upon the contributory negligence of the plaintiff.

Both at the conclusion of the plaintiff's evidence, and at the conclusion of all of the evidence, the defendants moved the court to strike out all the evidence on the ground that the plaintiff was guilty of contributory negligence. The trial court overruled the motion, and after a verdict was returned in favor of the plaintiff, refused to set aside the verdict.

The accident occurred sometime between six and seven o'clock p. m., on January 6, 1937, on U. S. highway No. 1, at a point within, or near, the southerly boundary of the town of South Hill, in Mecklenburg county. This highway is a main heavily traveled thoroughfare from the north to the south, and passes through the town of South Hill. On leaving South Hill going southwardly, there is a moderate left-hand curve in the highway, beginning at a point about opposite a service station owned and operated by a man named Willis. This service station is on the western side, or right-hand side of the highway proceeding southwardly. On the east side, almost directly opposite, is a service station and garage owned by a man named Pearson, and operated under the management of C. A. Pulley. Proceeding further from these two service stations around this left-hand curve, one next reaches property on the right-hand side used by the State Highway Department. The curve terminates opposite this latter property, and continues southwardly in a straight line on a slight down grade, the exact degree of which is not shown in the record. About three hundred yards or more distant southerly from the end of the curve, on the straight road, and next to the Highway Department's property, is a service station of Bud Mitchell, also on the western side of the road. There is a twelve-

foot "good surface" driveway extending from this latter station to the highway covering between forty-five and fifty feet in distance. Still going southwardly a distance estimated from three hundred to five hundred yards, one next comes to a service station and tourist camp operated by Carter Gill, also on the western side of the highway. The highway in the vicinity of the scene of the accident is eighteen feet wide, with a six-foot dirt shoulder on each side.

The plaintiff spent the major portion of the above day hunting, having started out about 9:00 a. m., and quitting when darkness came. He then went out to the highway, and secured a ride on a bread truck for himself and dog to the town of South Hill. Upon his arrival there, he states he purchased from a "liquor store" a pint of whiskey, from which he admits he subsequently took two drinks before the accident.

He then went to Pearson's service station. Here he met one, B. L. Matthews, and he admits that the two of them went to a shed back of the station, where they took a drink. Matthews states that they took several drinks from a quart bottle, or a bottle containing a fifth of a gallon. They went back into that station, where Gordon purchased and drank a bottle of beer, remaining there about fifteen minutes. Matthews invited Gordon to go home and spend the night with him, because he thought the plaintiff was "feeling pretty good," and ought to have been in bed. Instead, the plaintiff went on down the road, saying that he was going to Gill's station, where he intended to "catch a ride" home. However, he went across the road to the service station of Willis, where he had some discussion relative to his dog's pedigree. According to Willis, the plaintiff, at that time, was "pretty well drunk." There is some testimony that he offered to sell his dog at this station for one dollar, and that he was subsequently ordered out of the station. He then returned to Pearson's, where he left his dog and gun. Here he was refused the purchase of more beer, Mr. Pulley testifying that he thought he had had enough to drink, and that "he was intoxicated—badly in-

toxicated," and he would not have let him have the beer if he had observed his condition when he first came in.

The plaintiff then left and went on down to Gill's station. He does not remember whether he took any drinks while there or not, nor does he know how long he stayed there. He said that after "carrying on a lot of foolishness," he sat down beside the stove and went to sleep. Mr. Gill said that the plaintiff looked "as though he had had something to drink." He awakened the plaintiff, and told him "that he had to get up, that he couldn't stay there and sleep like that." The plaintiff admits that while he was in this station, he "was right high." Gordon then left there, and went back northwardly up the road towards the scene of the accident.

The plaintiff's memory is hazy as to the happenings in the several service stations visited by him, and he did not remember the substance of his conversation with Matthews, nor the refusal of Pulley to sell him more beer.

The several witnesses testified variously as to the condition of the weather on that night, all stating that it was very dark. Some said that it was raining and drizzling, and others that it was disagreeable, foggy and misty; and the plaintiff testified that it was "kind of misty."

We will consider next the evidence of the plaintiff as to his further movements up to the time of the accident. He says he walked northwardly on the left-hand edge of the hard surface of the highway, the westerly side, towards South Hill, intending to go back to Pearson's service station. While he was walking in this manner, he saw the approaching lights of the defendants' automobile as it rounded the curve, which terminates at the State Highway Department's property. He says the automobile was four hundred yards distant in front of him when he first saw its lights. He continued to look at the approaching car from the time when he first saw it until the car was "but ten or not over fifteen steps" from him, at which time he pulled down the brim of his hat in order to shade his eyes; but still maintaining his position and watching the

approaching automobile. He saw, and had his eyes on the car until the actual impact. He said he was so near to the left-hand edge of the hard surface that two steps would have put him on the shoulder of the road, where the car would have cleared him. He does not recall any car or cars were passing him bound northward at the immediate time of the collision; but does remember that some cars had passed him going north at about that time. When asked to explain why he didn't take the two steps over to the shoulder of the road to save himself, he replied, "Because I thought the car was clear of me, and that is why I didn't step off." He admits the car was on the hard surface of the road at the time it hit him.

It was shown by other evidence that at the time of the collision, and in the immediate vicinity, there were three cars proceeding northwardly, and at least one following the defendants' car proceeding southwardly. The middle of the three cars proceeding northwardly was being driven by Mr. Nickols with his wife, and was fairly close to the rear of the first car. Mr. Nickols saw the plaintiff by means of his own headlights, at about a distance of twenty feet. He did not see the car driven by Jones until the latter's car was clearing the car ahead of him, Nickols. Under the circumstances, he sensed an impending collision. When the Nickols' car and the car of the defendants' were about opposite, or nearly past each other, the plaintiff was struck by the right front part of the defendants' car.

The only damage to Jones' car consisted of a bent right headlight, and possibly a slightly indented right fender. The speed of that car was variously estimated at from fifteen to thirty-five miles per hour. Gordon, from his position, estimated it at from forty to fifty miles per hour, although he was unwilling to swear to it. The defendant, Jones, says he was operating at a speed of from fifteen to twenty-five miles per hour, and that because of the glare of the headlights of the oncoming automobiles, he did not see the plaintiff until he was within five or six feet of him, and after he had cleared the lights of Nickols' car, at which

time the plaintiff was on the hard surface about four feet from its western edge. When he saw him, he "cut hard to the left and slapped his foot on the brake," but was unable to prevent the collision. He stopped his car within a distance of its length.

Jones looked out, saw the plaintiff lying on the side of the road, and proceeded to Gill's station, and returned with Mr. Gill to the scene of the accident to render necessary assistance.

Mr. Nickols could not stop immediately when he heard the crash, because of the cars behind him. He drove on to Pearson's station, turned around, returned to the scene of the accident, and found the plaintiff lying unconscious in the driveway to Bud Mitchell's station, about three to seven feet off the hard surface.

The plaintiff suffered a fracture of his right leg, both bones being broken, and other lacerations and bruises. He had a "bumper" injury, his right leg being apparently struck by the bumper of the car.

The record contains a large amount of additional testimony relative to what occurred after the accident, to prove or disprove the charge that the plaintiff was intoxicated at the time of the accident. Dr. Bracey, who was first called, and who was with the plaintiff from approximately 6:30 p. m. until 10:00 p. m., said that immediately after the accident there was the odor of whisky on his breath; he was cursing profanely, and that there was both a repetition and impediment of speech, all indicating that he was under the influence of liquor. At the hospital in Richmond, at 11:30 that night, Dr. Faulkner smelled whisky on his breath.

Two police officers saw the plaintiff immediately after the accident at Mitchell's station. B. L. Smithson, the town officer, said he was drunk, "not so drunk that he couldn't talk," but he didn't think he knew what he was talking about. R. E. Bagley, a State police officer, said he smelled alcohol on his breath, and his actions, manner, and speech indicated that he was intoxicated.

As opposed to all of this evidence, Gordon says he knew what he was doing. Jack Gordon says that he knew his brother had something to drink, but he thought he knew what he was doing.

Except for the purpose, perhaps, of explaining the plaintiff's actions on the night in question, and especially at the time of the accident, we need not consider the question of his intoxication.

One cannot read the whole record without being impressed with the overwhelming effect of the evidence that the plaintiff had partaken of a sufficient amount of intoxicants to impair his mental and physical status. Indeed, every indication points to such an impaired state. Gordon admits drinking an uncertain amount of whisky in at least two drinks, and some beer. He smelled of the odor of whisky for hours. His tongue was thick and unsteady. He had become voluble and argumentive, and then sleepy. He wouldn't accept an invitation to retire to the home and bed of a friend. Instead, he left his dog and his gun at a service station. He did not set out on the way to his home, but started to walk in the opposite direction towards the town and towards the places which he had just recently left.

We must judge Gordon's mental condition from his actions. The described conduct is not unusual in persons consuming alcohol in quantities. It is entirely possible that this condition furnished the reason why plaintiff did not avoid the collision. But, if this be not true, can it be said that he acted like a reasonably careful and prudent, normal person in the full possession of his physical and mental faculties?

In fixing responsibility for the cause of the collision, we are called upon to determine the respective rights of pedestrians and operators of vehicles traveling upon the public highway.

Prior to the enactment of statutory or local regulations, pedestrians and operators of vehicles had mutual, coordinate and equal rights to the use of all sections of the public highway. It was the duty of each to share the highway

with the other, and each was required to exercise, under the circumstances of the occasion, the care of an ordinarily prudent person, so as not to injure another in the exercise of their respective rights in the use of the highway. In Virginia, the general rule has been modified, by certain limitations in the statute hereinafter referred to, with reference to crossing highways at intersections. Michie, The Law of Automobiles (1938), section 81; 2 R. C. L. section 1186; *Core* v. *Wilhelm,* 124 Va. 150, 98 S. E. 27; *Virginia Electric & Power Co.* v. *Blunt's Adm'r,* 158 Va. 421, 163 S. E. 329; *Lucas* v. *Craft,* 161 Va. 228, 170 S. E. 836; *Moore* v. *Scott,* 160 Va. 610, 169 S. E. 902.

The above four cases relate to crossing or intersection accidents, as distinguished from the case before us. *Core* v. *Wilhelm, supra,* was decided before the enactment of the statutes declaring the rights of a pedestrian at a street crossing. The other three cases, *supra,* were decided subsequent to the enactment of the statutes. These cases are helpful here only to the extent that they set out the general rule as to the reciprocal rights and duties of persons using the entire highway prior to the statutes. Such prior rights and duties are now, of course, the same except as changed by statutes.

Modern traffic conditions, caused by an increased use of motor vehicles, have required the enactment of new rules and regulations for the use of the public highways. The Virginia legislature has undertaken to regulate traffic and passage over, along, and across the highways of this State by the enactment of the Motor Vehicle Code, Virginia Code 1936, chapter 90B, section 2154 (48) *et seq.*

By section 2154 (112) of that Code, vehicles are required to be driven upon the right-hand side of a highway of sufficient width, subject to certain limitations, as follows:

"Drive on right side of highways.—Except as otherwise provided in section 2154 (115), upon all highways of sufficient width the driver of a vehicle shall drive the same upon the right half of the highway, unless it is impracticable to travel on such side of the highway and except when over-

taking and passing another vehicle subject to the limitations applicable in overtaking and passing set forth in sections 2154 (117) and 2154 (119)."

In section 2154 (123), drivers of such vehicles on a highway within a public or residential district, are required to yield the right of way to a pedestrian *crossing* such highway, under certain defined conditions.

By virtue of section 2154 (126), and its subsections, the rights of pedestrians crossing streets in towns and cities, and the right and duties of pedestrians upon the highways are also prescribed.

Subsection (f) therein reads as follows:

"Pedestrians shall not use the highways, other than the sidewalks thereof, for travel, except when obliged to do so by the absence of sidewalk, reasonable, suitable and passable for their use, in which case they shall keep as near as reasonably possible to the extreme left side or edge of same."

██ The Virginia Motor Vehicle Code recognizes the right of both the pedestrian and the operator of a vehicle, to use the highways for travel. It prescribes the portion which may be used by each of them under certain conditions. Under normal conditions the pedestrian must keep as near as reasonably possible to the extreme left side or edge of the highway, and the operator of a motor vehicle must drive upon his right half of the highway. And when it happens that both of them desire, or are required, to use, at the same time, that portion of the highway prescribed for their use, each of them must exercise his respective right to the use with due regard for the right of the other.

██ Neither the pedestrian nor the operator of a vehicle, in traveling along the portion of the highway prescribed for the use of each of them has a "right of way" thereon over the other, except as expressly provided by statute. The mere right to travel on a specified portion of a highway is not to be confused with a "right of way" thereon superior to the rights of others also entitled to use the highway. The right to the use is an equal and coordinate right. Both persons and operators of vehicles are held to

the exercise of ordinary care and are bound to respect the rights of each other. And when either observes danger to or from the other, he must exercise ordinary and reasonable care to avoid the danger. The duty of each to avoid giving or receiving injury is reciprocal.

It will thus be seen that the Virginia Motor Vehicle Code has made no change in the general rule applicable to the use of highways, which affects the instant case.

Was the plaintiff guilty of contributory negligence, which was the efficient or proximate cause of his injury?

Here we have a plaintiff, who admits he saw the defendants' automobile four hundred yards, or twelve hundred feet, in front of him as it rounded a curve. He continued to look at it, and never took his eyes off of it until it struck him. When it was some ten or fifteen steps, thirty or forty-five feet, from him, he pulled the brim of his hat down to shade his eyes from the lights driving down on him. He says that although he could have saved himself by taking not more than two steps to his left, over to the shoulder of the highway, where the car would have passed him in safety, he made no move to save himself. He could not escape the knowledge that the oncoming car of the defendant was meeting, in the immediate vicinity, other cars with lights burning, and occupying the opposite half of the highway. Yet, he stubbornly maintained his position on the road, two steps from the extreme left side of same, and continued to maintain it without a single effort to remove himself from peril of the gravest nature visibly rolling down upon him.

Not even at a street crossing, or intersection, where the pedestrian has a right of way, does he have the right to carelessly enter or cross the intersection regardless of approaching traffic. *Meade* v. *Saunders,* 151 Va. 636, 144 S. E. 711.

The plaintiff, Gordon, had a clear view of the approaching car. He was confronted with a situation where its onward progress made a collision inevitable if one of them did not move out of the way. Passing cars blocked the approaching

automobile from the left side of the road.  Gordon had ample opportunity to avoid the collision, but for some reason, which he does not satisfactorily explain, declined and refused to exercise the normal instinct of self-preservation.

Conflicts in the evidence on material points are lacking. The evidence of the defendant, Jones, that the plaintiff was four feet from the edge of the hard surface of the pavement is corroborated by the statement of the plaintiff that it required but two steps for him to get to the shoulder of the road.  There is no evidence to show that the defendants' car was driven at an unreasonable or reckless rate of speed; none to show that Jones knew of the condition of Gordon, or that the latter would not protect himself, or that Jones saw Gordon in time to avoid striking him.

The plaintiff can make no stronger case than is shown by his own testimony.  He is bound by his account of what he saw and did.  His own evidence discloses that he was guilty of contributory negligence as an efficient and proximate cause of the collision.  *Thalhimer Bros* v. *Casci*, 160 Va. 439, 168 S. E. 433; *Chakales* v. *Djiovanides*, 161 Va. 48, 170 S. E. 848; *Virginia Electric & Power Co.* v. *Vellines*, 162 Va. 671, 175 S. E. 35; *Bassett & Co.* v. *Wood*, 146 Va. 654, 132 S. E. 700; *Davis Bakery* v. *Dozier*, 139 Va. 628, 124 S. E. 411; *Massie* v. *Firmstone*, 134 Va. 450, 114 S. E. 652.

This court has frequently held that where one is under the duty to exercise reasonable care for the safety of himself and others, the wilful or careless failure to take any available step whatever for his own safety when danger is apparent, and can be avoided, constitutes negligence.  Even if a defendant be guilty of negligence, this does not relieve a plaintiff from avoiding injury if there is an opportunity for him to avoid it up to the moment of the collision.  This is but another way of saying that the doctrine of the last clear chance applies to a plaintiff as well as to a defendant. This is true when the negligence of both continues to the moment of the accident, and contributes to the injury, unless there are some peculiar circumstances to take it out of

the rule. *Green* v. *Ruffin,* 141 Va. 628, 125 S. E. 742, 127 S. E. 486.

So this court held in *Meade* v. *Saunders, supra,* where a pedestrian at a street crossing, saw an automobile approaching, but nevertheless left his safe place on the curb to cross in front of the approaching car, and did not see it any more until he was struck.

In *Putney Shoe Co., Inc.* v. *Ormsby's Adm'r,* 129 Va. 297, 105 S. E. 563, a pedestrian walked out into a busy street intersection, without looking, and was struck by an automobile, which he might readily have seen coming towards the intersection, and was denied a recovery.

In *Bailey* v. *Fore,* 163 Va. 611, 177 S. E. 100, the above two cases were cited, and the doctrine therein affirmed.

In *Virginia Electric & Power Co.* v. *Ford,* 166 Va. 619, 186 S. E. 84, 85, where the evidence was nothing like so clear as in the instant case, Chief Justice Campbell said, quoting from *Virginia Electric & Power Co.* v. *Vellines, supra,* "Continued and concurring negligence is a complete defense unless there be some circumstances or superadded facts which would make reliance upon it inhuman and culpable. One cannot maim or injure another merely because he is negligent. It is only when the superadded facts or circumstances make the conduct of the defendant the proximate cause that the rule applies." (Page 87.)

Assuming that the defendant here was negligent in operating his motor vehicle under the conditions recited, he had no knowledge, nor anything to put him on notice, that the plaintiff was unable to protect himself. There is no reason for discrediting his testimony, that he was unable to see the plaintiff in time to save him from injury on account of the lights on the approaching cars. There was no time for effective action after the discovery of the peril of the plaintiff.

In order to apply the doctrine of the last clear chance, the burden was upon the plaintiff to show affirmatively by a preponderance of the evidence that the defendant might have avoided the collision by the use of ordinary care

after he discovered, or should have discovered, the peril of the plaintiff.

The doctrine of the last clear chance, as applying to both parties, has been so often discussed by us that it is doubtful if anything more of value can be added. It has been well stated in *Green* v. *Ruffin, supra.* There a woman attempted to cross the street between intersections, though she saw an automobile approaching one hundred and twenty feet away, thinking she could make her way safely, and was struck as she was about to step on the sidewalk. Said this court, 141 Va. 645, 125 S. E. 747:

"Assuming that the plaintiff was negligent, it was her duty, with the automobile in plain view, coming toward her, to have looked and stopped when such act would have been effective. She had the same last clear chance to protect herself as defendant had to protect her, for the doctrine of last clear chance is a duty imposed by law on both the plaintiff and the defendant. If, being in plain view of each other, and with equal opportunity to prevent the accident, they are guilty of concurring negligence, there can be no recovery."

The language of Mr. Justice Gregory, discussing the doctrine of the last clear chance, in *Hutcheson* v. *Misenheimer,* 169 Va. 511, 194 S. E. 665, is peculiarly applicable to the instant case. Said he (page 667) : "To apply the last clear chance to the facts here would in effect amount to the introduction of the comparative negligence doctrine which, of course, has not been adopted in Virginia except in certain cases, and to wipe out as a defense contributory or concurring negligence."

To like effect we cite *Roanoke Railway & Electric Co.* v. *Carroll,* 112 Va. 598, 72 S. E. 125; *Saunders* v. *Temple,* 154 Va. 714, 153 S. E. 691; *Frazier* v. *Stout,* 165 Va. 68, 181 S. E. 377; *Virginia Electric & Power Co.* v. *Ford, supra.*

The case of *Catron* v. *Birchfield,* 159 Va. 60, 165 S. E. 499, relied on by the plaintiff, may be readily distinguished from the instant case. There a car driven by Mrs. Birchfield on a road eighteen feet in width, with gravel shoulders

about two feet in width, overtook and passed another car. There was snow which had been cleared from the road except on the extreme sides. The man driving the car which was overtaken, saw Catron some thirty or forty yards down the road facing him, just as the Birchfield car passed him. There was evidence that the windshield of the Birchfield car was dirty and covered with mud and muddy water to such extent that it was necessary after the accident to stop and wipe the windshield, in order to see properly. Although there was evidence that Catron had been drinking several hours before the accident, there was no evidence that he was then intoxicated. There were no passing cars to obstruct the vision of Mrs. Birchfield. There was no evidence that Catron saw her coming directly towards him at a sufficient distance for him to have stepped aside. There was ample space for Mrs. Birchfield to have passed to her left. We held that there was sufficient evidence to take the case to a jury.

We are aware of the weight which should be given to a jury's verdict, confirmed by a judgment of the trial court. It will be remembered also that we have not hesitated to reverse such judgments when they are not supported by the evidence.

The view which we have taken makes it unnecessary to discuss the numerous assignments of error to the granting and refusal of instructions. The foregoing opinion answers most of the principal questions.

Upon the facts presented by the record, the learned judge of the trial court could very properly have struck the evidence, or have set aside the verdict of the jury and entered judgment for the defendants.

Since there should have been a final judgment for the defendants, and as it appears that all the facts were fully developed upon the trial, such a judgment will be entered here.

*Reversed.*