E. R. LAWSON, Appellee, v. LEW FORDYCE, Appellant.

No. 46717.

DECEMBER 11, 1945.

30

McNett, Kuhns & McNett, of Ottumwa, for appellant.

Ralph H. Munro, of Fairfield, for appellee.

BLISS, J.— This case has been tried three times in the district court. In the first trial there was a verdict for the plaintiff of $2,500, which was set aside and a new trial granted by the trial court because of submitting a ground of negligence which it had stricken. In the second trial, at the close of all the evidence, the court sustained the defendant's motion for a directed verdict based upon the grounds that the evidence was insufficient to show any negligence of defendant which proximately caused the injury and was also insufficient to show plaintiff's freedom from contributory negligence. On plaintiff's appeal to this court the judgment entered against him, after the adverse ruling on the motion to direct, was reversed for the reason that the court erred in sustaining the motion, since, under the record, the issues of negligence and freedom from contributory negligence should have been submitted to the jury. Lawson v. Fordyce, 234 Iowa 632, 12 N. W. 2d 301. Defendant presented a ninety-six-page petition and argument for rehearing to this court, which was denied. In the third trial the jury returned a verdict of $5,000 for plaintiff. In that trial the defendant filed a motion for a directed verdict after both sides had rested. While it contained a few more subdivisions than the motion to direct in the second trial, the grounds were, in substance and effect, the same. A forty-four-ground motion for new trial and a thirteen-ground motion for judgment notwithstanding the verdict were filed and overruled. On this appeal the defendant-appellant has filed briefs and arguments comprising two hundred sixty-two pages and containing twenty-seven assignments of error.

The second and third trials were tried upon the same petition and the same answer. The latter was a general denial. The petition, in substance, alleged: Plaintiff's freedom from

contributory negligence; on January 9, 1940, while he was leading a cow easterly along the south part of the traveled portion of a highway in the town of Libertyville, Iowa, the defendant approached him from the rear in an automobile, which he was driving quietly, and passed plaintiff and the cow without giving any audible signal of his approach and without any knowledge on the part of plaintiff that he was so approaching, and startled and scared the plaintiff's cow, causing her to lunge forward suddenly, striking the plaintiff and knocking him down, breaking his left hip; the defendant did not sound his horn or give any audible signal of his approach at a reasonable distance before passing the plaintiff, and under the circumstances, in the exercise of reasonable and ordinary care should have done so; the graded portion of the highway was twenty-six feet in width and plaintiff was traveling along the south edge; the defendant was guilty of negligence in failing to give an audible signal of his approach at a point at a reasonable distance before passing him.

I. We have read the records in this appeal and in the first appeal. In the second trial the plaintiff testified and introduced the testimony of six witnesses. In the third and last trial he testified and used the same witnesses. The testimony offered in behalf of plaintiff is strikingly the same in both of these trials. In the last trial some testimony was read from transcribed testimony and depositions used in earlier trials. In the second trial defendant was a witness and used four other witnesses. In the last trial he was a witness and used the same four witnesses of the second trial and two additional witnesses. The two latter were occupants of the Horn automobile and their testimony was merely cumulative to the testimony of the other two occupants of that automobile, who were witnesses for defendant in the last two trials. Cumulative testimony is not such additional evidence as materially changes the evidential record. Noyes v. Des Moines Club, 186 Iowa 378, 379, 170 N. W. 461, 3 A. L. R. 605; 5 C. J. S. 1281, 1283, section 1827; 3 Am. Jur. 553, 554, section 1000. Defendant's witness Early, a surveyor who took some elevations and measurements along the highway and gave some testimony as to distances one could see along the highway from different points,

was a witness in the second trial and his testimony therein was read in the last trial. Under this record material or substantial changes in the evidence would not be expected and there were none. Some slight variations in the testimony received on behalf of defendant in the last trial are more favorable to the plaintiff than to the defendant.

The last two trials having been submitted on identical pleadings, with necessarily identical issues, and upon evidence substantially and materially the same, the application of the doctrine of "the law of the case" is of much importance in the determination of this appeal. It has been stated and applied by this court in scores of decisions and no discussion of it should be necessary except for a contention urged by the defendant. The principle is thus stated in Russ v. American Cereal Co., 121 Iowa 639, 640, 96 N. W. 1092:

"It is the settled rule in this state that the decision of this court upon the first appeal becomes the law of the case, and is to govern upon a subsequent trial thereof in the district court, and upon another appeal, unless the facts before the court upon the second trial are materially different from those appearing upon the first."

An aggrieved party may, by statute and the rules of this court, petition the latter for a rehearing on the appellate decision. But, such relief being denied, the said appellate decision becomes conclusively binding in the further progress of that case upon the litigants, the trial court on retrial, and the appellate court. This court, on a second appeal of the same case, when the same rulings or legal questions are presented under substantially the same record, "will not revise, reverse, or review its former decision." Burlington, C. R. & N. Ry. Co. v. Dey, 89 Iowa 13, 24, 56 N. W. 267, 271. "Likewise, matters necessarily involved in the determination of a question are settled by the decision when the same are again presented on a subsequent appeal." 3 Am. Jur. 549, section 994. See, also, City of Hastings v. Foxworthy, 45 Neb. 676, 63 N. W. 955, 34 L. R. A. 321, 333. This court, by decision, has never departed from this settled rule stated in the above-noted cases.

It applies in all its force to the appeal before us. In our

decision on the first appeal we held that the evidence was of such weight, character, and sufficiency that the issues of whether the defendant was negligent as alleged, of whether such negligence and the failure to give warning with his horn as required by section 5034.41, Code of 1939, were the proximate cause of plaintiff's injury, of whether the plaintiff was free from negligence contributing in any degree to his injury because of the manner in which and the places on the highway where he led the cow and because of the use he made of his senses of sight and hearing, should have been submitted to the jury for its determination.

These holdings of this court were mandates to the trial court which it was required to carry out, subject to the pleadings, the issues, and the evidence introduced. Under the record it would have been error not to submit these issues to the jury. Under that record the "law of the case," as announced on the first appeal, is decisive and binding on this court on the appeal now before us. There was no error in the submission of the above-stated issues to the jury. Consequently there is no merit to any error assigned by defendant which is based upon the alleged insufficiency of the evidence to sustain said issues. The verdict of the jury thereon is sustained by the evidence.

II. Plaintiff seeks to avoid the force of the "law of the case" rule as applied to this case. He contends that it is merely a rule of convenience, generally adhered to but not necessarily, and that this court is not bound by the decision and rulings on the first appeal of a case if on the second appeal it is convinced that it was wrong on the first appeal. Such contention disregards every decision of this court bearing upon the question. No decision of this court so holds.

In Barton v. Thompson, 56 Iowa 571, 572, 9 N. W. 899, 41 Am. Rep. 119, the court said:

"It is the established doctrine of the courts that a decision once made in a case constitutes the law of that particular case, and will not upon a subsequent appeal in the same case be *overruled or examined, however well satisfied this court may be that it is erroneous.*" (Italics ours.)

34

Other decisions expressly holding that the "law of the case" cannot be disregarded or defied on retrial or reappeal, whether right or wrong, are: Hensley v. Davidson Bros. Co., 135 Iowa 106, 107, 112 N. W. 227, 14 Ann. Cas. 62: "The law of the case was settled on the former appeal (103 N. W. 975); and, *whether right or wrong,* that ruling in so far as applicable to this case is a part of the irrevocable past." (Italics ours.) Bryan & Co. v. Scurlock, 190 Iowa 534, 538, 180 N. W. 684, 686: *"Right or wrong,* that is the law of the case. For the purposes of any retrial here, whatever was done or not done became a finality when the petition for rehearing was denied. In the same cause we cannot change our position in a second appeal, *even if we were utterly in error on the first appeal."* (Italics ours.) Burlington, C. R. & N. Ry. Co. v. Dey, supra, 89 Iowa 13, 24, 56 N. W. 267, 271: "The law is well settled in this state by an unbroken chain of decisions that, as between the parties to a suit, a decision therein becomes an adjudication *even if erroneous * * * ."* (Italics ours.) Hendershott v. Western Union Tel. Co., 114 Iowa 415, 418, 87 N. W. 288, 289: "It is not admissible to allow a case to be tried a second time in accordance with express directions given by this court on a previous appeal, and then question on a second appeal the correctness of the views expressed on the former appeal, *no matter how erroneous they may be.* The law announced on one appeal continues to be the law of the case for subsequent trials, *whether right or wrong.* It would be manifestly unjust to reverse the lower court for following the express direction of the supreme court given in the very case." (Italics ours.) See, also, Anthon State Bank v. Bernard, 198 Iowa 1345, 1350, 201 N. W. 59, citing the quotation noted above from Barton v. Thompson, supra, 56 Iowa 571, 572, 9 N. W. 899, 41 Am. Rep. 119.

Jacobson v. United States Gypsum Co., 150 Iowa 330, 331, 130 N. W. 122: "That opinion [the first], *whether right or wrong,* made the law of the case, and it should be adhered to on this appeal." (Italics ours.) Larkin v. Burlington, C. R. & N. Ry. Co., 91 Iowa 654, 659, 60 N. W. 195, 196: "Having fixed it as the rule of the case on that appeal, *we do not consider the correctness of the holding on this appeal."* (Italics ours.) Vogt

v. City of Grinnell, 133 Iowa 363, 364, 110 N. W. 603: "Under familiar rules, the principles approved and applied in the decision of the former appeal must be taken as the law of the case upon the propositions there considered, and even if convinced (which we are not) that the views there expressed were erroneous, we should not be at liberty to reopen the discussion. This rule disposes of most of the argument by counsel for appellant, which is largely devoted to criticism of the views expressed by us in the first opinion * * * ." (The last sentence applies to defendant's argument in the appeal before us.)

Other decisions expressing in similar language the position of the court on this proposition as noted in the above-stated quotations are: Jones v. Sioux City, 192 Iowa 99, 102, 103, 182 N. W. 644; White v. International Text Book Co., 156 Iowa 210, 213, 136 N. W. 121, 42 L. R. A., N. S., 346; Crouch v. National Livestock Rem. Co., 210 Iowa 849, 850, 231 N. W. 323: "It is a well-known rule of this court that, under such circumstances, the points decided in the first opinion are the law of the case *for all time,* and will not again be reviewed by us." (Italics ours.); Babcock v. Chicago & N. W. Ry. Co., 72 Iowa 197, 199, 28 N. W. 644, 33 N. W. 628; Adams County v. The B. & M. R. R. Co., 55 Iowa 94, 97, 98, 2 N. W. 1054, 7 N. W. 471; In re Estate of Cook, 143 Iowa 733, 737, 738, 122 N. W. 578, 580: "The law of the case was settled in the former appeal, and that should have been an end of it. Reed v. Howe, 44 Iowa [300] 303. When the law premise is once determined, *it becomes the law of that case to the end of time,* unless set aside or vacated by the proper proceedings." (Italics ours.); Hensley v. Davidson Bros., 143 Iowa 742, 744, 120 N. W. 95: "The judgment rendered by the trial court was in exact compliance with the directions given on the former appeal, *and that ends the controversy.*" (Italics ours.); Drake v. Chicago, R. I. & P. Ry. Co., 70 Iowa 59, 61, 29 N. W. 804, 805: "This being the second appeal, our former decision constitutes the law of this case, *whether right or wrong.*" (Italics ours.); Davis v. Curtis, 70 Iowa 398, 399, 30 N. W. 651: "It was not for that court [the trial court] to question the correctness of the ruling, nor is it allowable for this court to do so in any subsequent ruling in the same case."; Rice v. Grand

Lodge A.O.U.W., 103 Iowa 643, 644, 72 N. W. 770; Goben v. Des Moines Asphalt Pav. Co., 218 Iowa 829, 831, 833, 252 N. W. 262 (quoting the above-noted quotation in Hendershott v. Western Union Tel. Co., supra, 114 Iowa 415, 418, 87 N. W. 288); Russell v. Sioux City Gas & Elec. Co., 218 Iowa 427, 429, 255 N. W. 504, 506: "Rulings must become final some time, even upon questions that are difficult and perpetually debatable. We adhere, therefore, to our holding on the former appeal."; Northwestern Mut. L. Ins. Co. v. Gross, 218 Iowa 408, 409, 255 N. W. 511.

In Lavalleur v. Hahn, 167 Iowa 269, 271, 149 N. W. 257, 258, we said: "It is earnestly argued that our former holding is erroneous, and that it should be overruled. If that were so, it could not be done in this case. It is well settled that such former holding is an adjudication, and must be deemed as the law of the case, even on this appeal." See, also, Collins v. Iowa Manufacturers Ins. Co., 188 Iowa 289-291, 176 N. W. 253; Munn v. Independent Sch. Dist., 188 Iowa 757, 769, 176 N. W. 811. In Hall v. City of Shenandoah, 179 Iowa 1192, 1205, 162 N. W. 575, 580, the court said: "This court approved the law as stated, with suggestions which were followed, and it now stands as the law of the case. * * * *Whether right or wrong, it is the law of the case.*" (Italics ours.)

The thought definitely expressed in the cases cited and quoted from above might fairly be said to be the implied thought in each of the decisions of this court where the rule under discussion has been applied. Certainly, in none of them has the decision of the court held to the contrary. See White v. McVicker, 219 Iowa 834, 837, 259 N. W. 465; Reimer v. Musel, 220 Iowa 1095, 1096, 264 N. W. 47; Spaulding v. Miller, 220 Iowa 1107, 1109, 264 N. W. 8; Ryan v. Trenkle, 203 Iowa 443, 444, 212 N. W. 888; Boles v. Hotel Maytag Co., 221 Iowa 211, 212, 265 N. W. 183; Boeck v. Modern Woodmen of America, 183 Iowa 211, 166 N. W. 1048; Sears, Roebuck & Co. v. Nelson, 230 Iowa 936, 299 N. W. 398; Minnesota Linseed Oil Co. v. Montague & Smith, 65 Iowa 67, 68, 21 N. W. 184; Swan v. Dailey-Luce Co., 228 Iowa 880, 882-884, 293 N. W. 468; McKlveen v. Townley, 233 Iowa 328, 331, 332, 7 N. W. 2d 186; Whitfield v. Sears, 233 Iowa 887, 890, 891, 10 N. W.

2d 564; Bair v. Shoultz, 233 Iowa 980, 981, 7 N. W. 2d 904; Kenyon v. Illinois Cent. R. Co., 187 Iowa 277, 279, 280, 173 N. W. 44; Sanders v. Sutlive Bros. & Co., 187 Iowa 300, 303, 174 N. W. 267, 268, 6 A. L. R. 1503: "However much that ruling may be questioned, it is the law of the case, and must stand unless it can be said that other evidence, subsequently adduced, warranted a different finding." Norman v. Sioux City, 200 Iowa 1343, 1348, 206 N. W. 112, 114: "Not only is the former decision the law of the case, *but it will not be overruled in the same case.*" (Italics ours.) See, also, Garretson v. Merchants & Bankers Ins. Co., 92 Iowa 293, 295, 60 N. W. 540; Kirby v. Chicago R. I. & P. Ry. Co., 173 Iowa 144, 157, 158, 155 N. W. 343; Sawyer v. Hawthorne, 178 Iowa 407, 409, 410, 158 N. W. 665; Pew Co. v. Karley & Titsenor, 168 Iowa 170, 175, 150 N. W. 12, L. R. A. 1916A, 469; Kascoutas v. Federal L. Ins. Co., 193 Iowa 343, 346, 185 N. W. 125, 22 A. L. R. 294; In re Assignment of Cutler & Horgen, 213 Iowa 983, 986, 234 N. W. 238; Heffner v. Brownell, 75 Iowa 341, 342, 39 N. W. 640; McFall v. Iowa Cent. Ry. Co., 104 Iowa, 47, 49, 50, 73 N. W. 355; Borg v. Des Moines City Ry. Co., 194 Iowa 569, 571, 189 N. W. 786.

Defendant has cited some authorities from other jurisdictions in support of this contention but the decisions of this court to the contrary have the support of overwhelming authority. While noting support for the position of defendant, 3 Am. Jur. 546, section 990, subject matter "Erroneous Decision," states:

"As has been shown in a previous section [985], there are almost numberless cases in which the courts have stated and discussed the general rule that a prior decision is conclusive on the same questions between the same parties on a subsequent appeal."

In 5 C. J. S. 1276, 1277, section 1824, it is said:

"As a general rule a decision on a prior appeal of the same case is held to be the law of the case whether that decision is right or wrong, the remedy of the party deeming himself aggrieved being to seek a rehearing."

And in 5 C. J. S. 1499, 1501, section 1964, it is said:

"* * * and such rule holds good regardless of whether the decision of the appellate court is right or wrong, it being said that it is only where the decision is deemed erroneous that the doctrine of 'the law of the case' becomes at all important." Citing Tally v. Ganahl, 151 Cal. 418, 90 P. 1049.

In addition to the outside authorities he cites, defendant's chief reliance is in language in the following quotation in the opinion of this court in LaSell v. Tri-States Theatre Corp., 235 Iowa 492, 504, 17 N. W. 2d 89, 95, to wit:

"Appellant urges that the theory of the law of the case is a rule of convenience generally adhered to, but not necessarily so, and that the court is not precluded by a decision which on later consideration it is convinced is wrong. This is no doubt true, and it is also true that the court has the power to correct a former decision when convinced that it is wrong; but when a decision is once entered upon a particular branch of a case on appeal, unless the court is fully and thoroughly convinced that an injustice will be caused thereby, it should adhere to its former opinion. The district court on retrial must necessarily look to the pronouncement of the appellate court as a guide. Nor can the supreme court on a second hearing lightly disregard a rule established by it in the same proceeding. On this appeal the majority of the court adhere to their former opinion as to contributory negligence and the law of the case on this point has been determined as in the first appeal."

While the proposition was no doubt argued in that case, the language relied upon by defendant expresses only a dictum. It is a comment not necessary to the decision and contrary to it. It is not a determination of the proposition. There was a similar situation in Fellers v. Modern Woodmen of America, 192 Iowa 561, 562, 563, 185 N. W. 93, where Preston, J., used this language in the opinion:

"To the writer it seems that there is force in this contention [that of the defendant herein], and I so expressed myself in the case of Bryan & Co. v. Scurlock, supra, [190

Iowa 534]. *But it is unnecessary to determine that point, for the reason that we are not convinced that the opinions on the prior appeal are erroneous.* On the contrary, we are all agreed that the case was correctly determined in the first place." (Italics ours.)

Likewise in the LaSell case, there was no determination of that proposition and no intention of the court to determine it.

Defendant uses this contention of his as an excuse for completely rearguing the first appeal, and with much greater elaboration and profuseness, citing and quoting from the same authorities and additional ones, and giving additional reasons, although there is no evidence of additional facts. It is virtually a second petition and argument for a rehearing. Some comments of this court are apropos. In Hartford Fire Ins. Co. v. Mellon, 206 Iowa 182, 185, 220 N. W. 331, 332, the court said:

"Appellants' argument is still predicated in part upon the contention that our opinion was itself erroneous. To that extent the appellants' argument is not helpful. Such former opinion has become the law of the case, and it is as binding upon us as it is upon the litigants. It leaves little to be said by us now upon this feature of the case."

In Munn v. Independent Sch. Dist., supra, 188 Iowa 757, 769, 176 N. W. 811, 816, the court said:

"* * * the question sought to be raised is no longer an open one, and the decision so made is, to that extent, the law of the case."

In Ellis v. State Ins. Co., 68 Iowa 578, 579, 27 N. W. 762, 763, 56 Am. Rep. 865, it is said:

"Evidence which we held was wrongly excluded we are now asked to virtually hold was rightly excluded, and we are asked to hold this, *not by reason of any new fact which is put into the case, but by reason of a new legal position taken by the plaintiff's counsel.* We are asked to virtually hold that the evidence was rightly excluded, in contravention of our former ruling, *because the plaintiff's counsel have devised a better argument for excluding it.*" (Italics ours.)

The doctrine of "the law of the case" is a well-recognized rule in all jurisdictions. In the footnotes to the rule as stated in 5 C. J. S. 1267 et seq., section 1821, are seven pages in fine print listing, in support thereof, hundreds of citations from fifty or more jurisdictions, and another page of later citations in the corresponding page of the pocket supplement.

It is a wholesome and a salutary rule. It prevents the presentation of cases by the piecemeal. It puts a limit on one's "mending his hold." It aids in putting into effect the ancient maxim that it is to the interest of the public to make an end of litigation in a case. In 5 C. J. S. 1274, section 1821(b), it is stated:

"Again the rule has been said to be founded on the policy of ending litigation, and to be necessary to enable an appellate court to perform its duties satisfactorily and efficiently, which would be impossible if a question, once considered and decided by it, were to be litigated anew in the same case upon any and every subsequent appeal."

Twenty-four Jefferson county jurors have heard the evidence and the arguments and have necessarily found that the defendant's negligence was the proximate cause of plaintiff's injury and that the plaintiff was free from contributory negligence. The jury in the last trial were evidently mostly farmers, whose training, experience, and qualification especially qualified them to weigh the testimony and decide the case, since the able attorney for defendant, in interrogating his witness concerning the superiority of bovine vision to the side and back over that of a human being, interpolated: "I don't know whether we ought to ask you or not because *all these farmers know.*"

III. Defendant also urges that there was additional testimony in the last trial which made the issue of contributory negligence of plaintiff one of law for the trial court to determine. This testimony of the plaintiff was as follows:

"Q. What else did you do to ascertain if there was anything approaching you from the west or the rear than glance back. A. I don't think I did anything. Q. Didn't you listen?

A. I couldn't say that I did. Q. You don't think you did?
A. I don't remember of it * * * Q. And you say you didn't
listen for an automobile? A. I guess not. Q. The only thing
you did was to look? A. That's right. * * * Mr. Fordyce
called upon me in the Jefferson [County] Hospital the next
day after the accident. Q. Did you not state to Mr. Fordyce
at the time he called upon you at the hospital that you knew
the cow was afraid of cars and that you just got careless and
got hurt? Didn't you make that statement? A. Yes, sir, I
said that. You bet I did. Q. What? A. Yes, sir, I said that.''

Defendant argues:

''The testimony of the plaintiff relied on in this division
was new and different from his testimony on the prior trial
and this proposition was not submitted, argued or discussed
in the opinion on the former appeal.''

The record on this evidence as it appeared in the second
trial, in the abstracted record, in the testimony of the defend-
ant is as follows:

''I saw him [plaintiff] the next day at the hospital.
Well, I said to him,—asked him if he didn't see me. He said
no, but he went right on to say that 'I knew the cow was afraid
of a car and I just got careless and got hurt.' That was all
the conversation in that regard.''

Plaintiff also testified in the second trial that he had
raised the cow from a calf; used her for a milk cow; she was
a quiet, gentle cow, that ''didn't scare readily.'' When he
saw the Horn car approaching:

''I took ahold of the cow with my right hand, *because I
seen this other car and I stayed on the lefthand side of the
road and held her until that car got past. I had hold of the
rope close to the halter.* * * * She jumped a little bit just as
the Brace Horn car passed, she pulled a little on the halter.''

Defendant amended the abstracted record to show more
fully the effect of a passing car upon the cow. Plaintiff testi-
fied on cross-examination, in substance:

"Oh, she jumped a little bit just as the [Horn] car passed. She jumped around like she wanted to get away from it is all. That is all she done. I had ahold of her and she just jumped— Oh, she pulled quite a bit. She didn't pull hard enough to get away. I had no trouble in holding her, she wasn't that bad. The Horn car was very close to me, approaching in the rear and about to pass when the cow jumped."

Also in cross-examination was the following:

"Q. So weren't you paying any attention to see whether the noise of a car might come to your hearing? A. I guess I thought a glance was good enough; I didn't happen to see anybody, and I supposed that was about all that was necessary."

The record as above set out shows that there was no material difference in the evidence in the last two trials respecting the subject matters referred to therein. The testimony at the second trial was fully as informative as that given in the last trial. It bore upon the issue of freedom from contributory negligence of the plaintiff and we are bound by the law of the case on that issue. Defendant fully argued that issue on the first appeal and this court held it was a jury question. The so-called additional evidence was in the record for defendant's attorney to argue if he saw fit. If he did not argue it on the issue of contributory negligence he has only himself to blame. As said in Hall v. City of Shenandoah, supra, 179 Iowa 1192, 1205, 162 N. W. 575, 580:

"If this particular point were not raised on the former appeal when this instruction was complained of and submitted to this court for its approval or disapproval, it was the fault of appellant."

This court was familiar with the abstracted record on the last appeal. Before determining the issues and propositions submitted it read and gave consideration to all testimony bearing upon each of them. It had knowledge of and weighed the particular items of testimony which the defendant says he did not submit or argue. The court cannot, of

course, comment in its opinion on every item of testimony considered by it in arriving at a finding of fact or a conclusion of law. As said in Gordon v. Chicago, R. I. & P. Ry. Co., 154 Iowa 449, 452, 134 N. W. 1057, 1058, Ann. Cas. 1914B, 113, with reference to the law of the case:

"While not specifically treating of this matter on the former appeal, *it was considered* and thought not to be erroneous." (Italics ours.)

It is said in 5 C. J. S. 1503, 1504, section 1964(c), the rule "does apply to and comprehend all points presented and decided and necessarily involved, regardless of whether or not such points are specially noted in the opinion, syllabi, or mandate * * * ."

IV. In both appeals the defendant argued vigorously, on the issue of his negligence, that the plaintiff and the cow were proceeding so peacefully and quietly he thought it was unnecessary to take the precaution of warning them by sounding his horn in his approach to them and that it was the better and safer plan to approach them very quietly and attempt to slip by without being discovered while passing. There was testimony in the last two trials by defendant and his wife, who qualified as experts on cows with respect to their shyness, wariness, and the impossibility of successfully stalking them from the rear. On the last trial there was some additional testimony indicating that the defendant and his wife had knowledge of the probable danger that the course they were about to pursue would suddenly alarm the cow by their admitted stealthy approach. She testified:

"Cows are unpredictable and *easily startled. Ordinarily a sudden noise or something of that nature will startle a cow.*"

The jury must have found, and were warranted in so finding, that the sounding of the horn at a sufficient distance to warn them and yet not startle the cow would have been what an ordinarily careful and prudent person would have done, instead of approaching them, as they say they did, so that the cow was not warned of their approach until startled by the unheralded close proximity of the automobile. The

44

very thing happened which their admitted knowledge and experience told them would most certainly happen.

V. In his argument generally, not only with respect to matters settled by the law of the case but to the instructions and requested instructions, the defendant presumes that matters testified to in his behalf on the last trial were verities. Some of the testimony was of such character that the jury might well have questioned the probative value of it. Plaintiff testified that as he led the cow from his driveway to the street he looked to the west, where an automobile, if one were there, would be visible at a distance somewhat in excess of two thousand feet. He testified that he did not see the defendant's automobile or any other automobile approaching from the west except the Horn car. He was not certain of its distance but said that when he had proceeded easterly along the left side of the street for about seventy-five feet the Horn car passed him and the driver of the car sounded the horn and the occupants laughed and waved at him. There were four persons in the car, Mr. and Mrs. Horn and their daughter and her husband. The Horn car went east on the street to the business part of the town. Plaintiff testified that after that car passed he looked to the west to see if a car was approaching before crossing to the right or south side of the road. He saw no car approaching and led the cow over the center line of the road. The cow walked in the right car track on the south half of the road and he walked to her left with the halter rope in his right hand. The snow plow had been along and pushed the snow to each side of the traveled way. After proceeding some distance he changed the rope from his right to his left hand and stepped from the left side of the cow to directly in front of her. The cow did not move to the right but followed him in the same path in which she had been walking. Plaintiff was not sure whether he looked once or twice to the west after he looked west when crossing over the center line. But he did not see the defendant's car or any other car approaching from the west. The last time he looked to the west was when he was about one hundred feet west of where the cow knocked him down. He was walking ahead and in front of the cow at about a three-mile-an-hour pace and he

turned his head only and looked back over his shoulder to the west. He saw no car. He was about one hundred feet west of Cowan Street when he was struck. That street is the western-most street of the town and is four hundred eighty-one and one-half feet east of the center of the Lawson driveway.

The Horn family lived a mile and a half west of Liberty-ville. Defendant lived two miles west of town. The Horn family were neighbors and acquaintances of both parties. Each occupant of the Horn car, as a witness for defendant, denied plaintiff's testimony as to the Horn car's passing him and the cow shortly after entering the highway, denied honking the horn or waving at him, denied having seen him leading a cow along the highway. They testified they did not see the defendant's car and the defendant testified that he did not see their car.

January 9, 1940, the date of the injury, was a cold, winter morning, with a strong northwest wind blowing. Each occupant of the Horn car, which was a one-seated coupé, testified that when they did drive into Libertyville that morning they saw the plaintiff lying in the snow in the ditch on the south side of the road, with a cow standing beside him. They testified that they recognized their friend and neighbor lying there. But they never stopped. They made no inquiry. They said he waved at them and they drove on. Horn testified that he saw plaintiff lying down and a cow near him. He turned his car to the left in the highway and passed to the north of plaintiff. He said he thought a lady was holding the cow. He drove a short block to the main intersection and then a little past Robinson's store to a service station. The daughter testified that she saw plaintiff and recognized him as he lay in the ditch. She remembered seeing the cow but did not remember whether anyone was holding her. The son-in-law's testimony was about the same. Mrs. Horn testified, in substance:

"I saw a man lying in the highway. My son-in-law said there was a man and a cow there. Then I just glanced. I didn't see who it was. I didn't pay any attention. I ascertained from the others it was Mr. Lawson. I wasn't interested I guess."

The occupants of the car never discussed the matter, so far as their testimony discloses. The father and son-in-law left the car at the service station and the ladies did not know where they were going. They saw the defendant going west from Robinson's store and followed him and they all arrived where plaintiff was lying almost together. The time elapsing between the injury to the plaintiff and the return of defendant must have been very short for defendant said that as soon as he stopped the car at Robinson's store he went "right back" to the plaintiff. If the improbable testimony of the Horn family is to be believed they must have been following the defendant's car quite closely, and yet they testified they never saw it. Mrs. Bell, in front of whose home the plaintiff was injured, was the first one to him. She was about to hang out her laundry and saw him lying in the street. She, *of course*, went to him at once and offered her help and plaintiff told her his hip was broken and for her to hold the cow and call for help. She did both. The driver of a bread wagon came from the west, and he, *of course*, stopped. The next arrivals were the defendant and Mr. Horn and his son-in-law. No witness saw the Horn car come from the west at the time they testified they came, although the defendant admitted in the last trial that he so testified at an earlier trial but was mistaken. Mrs. Bell, who was looking for aid and would have hailed them, testified that she never saw the Horn car pass by. The plaintiff, who was looking for help and who was on the spot they claimed to have passed, and who, of course, would have called to his neighbors, testified that the Horn car never passed by after he was knocked to the ground by the cow. The jury may have given full credence to the testimony of Mrs. Bell and the plaintiff and no credence to the testimony of the Horn family about their passing plaintiff as he lay in the ditch. If the jury did not believe that testimony it is not probable that it accepted their testimony about not driving by the plaintiff and his cow just after they came out of the driveway. If the jury believed the plaintiff and not the Horn family as to the time they drove to town, then it may have found it impossible to reconcile defendant's testimony that at all times he saw the plaintiff and his cow but at no

time saw the Horn car as it approached and passed them and continued on into Libertyville. The jury might reasonably have concluded that defendant was not within sight of plaintiff when the latter testified he looked and did not see him and that defendant approached at a much higher rate of speed than he testified to.

It is also to be kept in mind that plaintiff was not injured through the negligence of the defendant in striking him with his car, as is usually the case. It was a clear, bright day, and he was in plain view of the defendant, or of any other motorist who might approach him from either direction, and he had no reason to anticipate that he or his cow would be run down, with or without warning. There was no collision between the injured person and the other party. Neither did the plaintiff's position or place in the road have anything to do or have any causal or proximate relation or connection with the injury he received or with the negligence of defendant which caused the injury. His danger from that negligence was just as great on one side of the road as on the other. His duty or necessity to use care to avoid the specific negligence of defendant which caused the injury was no greater or different on the right side of the road than on the left. The negligence alleged which caused the injury was the attempt of the defendant to pass him and the cow without giving warning by sounding the horn. He was in just as great danger from this failure on the left side of the road as on the right side, and he was in just as good position on the right side of the road to inform himself of the approach of the defendant, or of any other motorist from the rear, as he would have been had he been traveling on the left side of the road. In other words, his position or place on the road, whether lawful or unlawful, was not a factor which contributed in any way or degree to his injury. It was for the jury to say whether it was not just as probable that the cow would have been startled, and have lunged into the plaintiff, by an unwarned approach of the car on the cow's right, as did in fact occur when such an approach was made on its left. It was for the jury to say whether there was any difference in the probability, and it was fully warranted under the facts and the law in saying that there

was not. This was the law of the case as determined by the first appeal and the defendant and this court are bound by it. The reasoning of the opinion in Hollins v. Crawford, La. App., 11 So. 2d 641, 644, quoted in our opinion on the first appeal, is unanswerable on this point.

Defendant, in his argument and in his requests for and exceptions to instructions, and in his multiple-pointed motions, disregards the matters above stated. He cites and discusses at length such cases as Kessel v. Hunt, 215 Iowa 117, 244 N. W. 714; Lindloff v. Duecker, 217 Iowa 326, 251 N. W. 698; Taylor v. Wistey, 218 Iowa 785, 254 N. W. 50; Fortman v. McBride, 220 Iowa 1003, 263 N. W. 345; and numerous other similar cases. They are collision or contact cases. They have little or no applicability to this case. The fact situations are different. It is true that these cases, or some of them, state that a pedestrian who walks in the right lane with the traffic is exposed to greater danger from the rear than a pedestrian who walks in the left lane and faces the traffic. But the danger which they refer to and which caused the injury in all such cases is the danger of *collision*. That is not the case before us. The plaintiff was safe from danger on the right-hand side had defendant given him warning, and the failure of the defendant to give him warning would have exposed him to the same danger and to the injury he received had he been on the left-hand side of the road. The positive authority of the opinions of this court in those cases, and ordinarily in every case, is coextensive only with the respective fact situation on which it is founded.

Owing to the extreme length of defendant's briefs and argument and the many errors assigned and numerous matters complained of it is not practicable to discuss them all at length. Many of the requested instructions unduly stress numerous specific items of disputed evidence which the defendant conceives to be favorable to him. The issues are few and simple and elaborate presentation cannot rob them of their simplicity. The defendant requested thirty-one instructions. The trial judge gave eighteen instructions and is to be commended for their conciseness and clarity and adequacy

in advising the jury on the law applicable. In ruling upon the twenty-seven errors assigned we will group such as we can.

VI. Errors 20, 21, 22, 23, and 24 are bottomed upon the admission of certain checks drawn and paid by plaintiff in satisfaction of nurse, hospital, and doctor services rendered him because of the injury received. The objections urged are that the nature of the services is not shown nor their connection with the injury which he received, nor is it shown that they were reasonable charges for the services. Plaintiff paid approximately $1,600 for all of such services that he received. He was in the hospital at Fairfield for eighteen weeks just after his injury. He was there later for X-rays and other attention. Defendant made no objection to the checks for the hospital, doctor, and nurse bills at Fairfield. The nature of the services, the items thereof, and their extent, and the reasonableness of the charges therefor were shown. The jury were thus advised as to what such kind of services, in general, were worth. The injury was the complete fracture of the neck of the left femur. When plaintiff left the hospital there was a union of the parts but the callus formation was not good. The callus formation and also the head of the femur were later absorbed. His attending doctor advised him to go to the Mayo Clinic at Rochester, Minnesota, and have a reconstruction operation performed. It was shown to be a highly specialized form of operation, in which the trochanter or bony processes on the neck of the femur are split off and driven into the end of the bone to make a new neck. He consulted Dr. Steindler, the eminent head of the orthopedic department of the children's hospital at Iowa City. He examined him and gave him a report and advised an operation. His charge was $15 and plaintiff paid him by check. He consulted Dr. Harken at Ottumwa, who examined him. His charge was $15, which plaintiff paid by check. Dr. Cook, the plaintiff's attending doctor, testified that these charges were reasonable. Plaintiff consulted Dr. Reynolds, an osteopathic physician, who examined him and gave seven treatments to his injured leg. He charged $10.50 and was paid that amount by plaintiff by check. The plaintiff went to the Mayo Clinic at Rochester. He testified:

"I was installed in the Colonial Hospital. While there under the advice of the Mayo Clinic I submitted to a reconstruction operation for *this hip.* I was attended by Dr. Gormley. He performed the operation. I had nurses in attendance while in the hospital."

His itemized bill at the hospital was $381, of which $330 was for sixty days at $5.50 per day, and the remaining charges were for board for special nurse, operating room, special diet, telegrams, telephone calls, dressings, drugs, and beverages. The hospital manager since 1925 testified by deposition as to the reasonableness of the charges.

The cashier of the Mayo Clinic for twenty-five years by deposition testified that the surgical and clinical charges of $250 and $50, respectively, were reasonable. The receipt of the clinic for $300 was received in evidence. Dr. Cook treated plaintiff after he returned from Rochester and testified to the operation there performed on his injured leg. Three nurses attended him at the Colonial Hospital. He paid one $9 for two days' service, eight hours a day, by check. Another he paid $14.50 by check for three days' service. Another nurse he paid $33 by check. There was no testimony as to the value of these nursing charges. These assignments of error are without merit. There is no claim that any of the charges are unreasonable. The reasonableness of all of the charges except the nursing charges were testified to by competent and qualified witnesses. In these later years, when doctors send the great majority of their patients to hospitals, where they have the care of nurses, we will presume that jurors are familiar with services ordinarily performed by them, whether they are graduate, registered, professional, or practical nurses, and with the reasonable value of their services. Here there was definite written evidence of payment and we have held that the fact of payment alone is sufficient to carry the question of reasonableness to the jury: See Reutkemeier v. Nolte, 179 Iowa 342, 352–354, 161 N. W. 290, L. R. A. 1917D, 273; Remington v. Machamer, 192 Iowa 1098, 1103, 186 N. W. 32; Lampman v. Bruning, 120 Iowa 167, 171, 94 N. W. 562; Bowsher v. Chicago,

B. & Q. R. Co., 113 Iowa 16, 21, 84 N. W. 958; Williams v. Ballinger, 125 Iowa 410, 414, 101 N. W. 139; Arnold v. Fort Dodge, Des Moines & So. R. Co., 186 Iowa 538, 547, 548, 173 N. W. 252.

VII. Assigned errors 1, 2, 3, 4, 5, 6, and 7 are all settled by the law of the case as decided on the first appeal, and are without merit.

VIII. Error is assigned because of the refusal of the court to give the requested instructions 22, 23, 25, 26, 27, 28, 28½. These instructions, in general, bear upon the care required of travelers upon the highways, and insofar as they are proper and applicable and did not unduly stress particular items of evidence, they were sufficiently covered in the instructions given by the court.

IX. There was no error in refusing request 23, as it required plaintiff to do more than to make such use of his senses of sight and hearing as an ordinarily careful and prudent person would have done under like circumstances, as the jury were told in the court's instruction 10. The request required him to "listen" as at a railroad crossing, to be at alert attention and giving active and sustained exercise of his auditory organs at all times to the approach of automobiles from the rear. A person can hear and hear efficiently without devoting his entire attention to the act. Travelers upon the highways need not have their heads "cocked" to catch every sound. They have equal rights, generally speaking, on those highways with every other traveler, and each has a right to rely upon every other traveler's compliance with the statutes and the laws of the road, and ordinary prudence, and upon the giving of such warnings as they require.

X. Requested instruction 26 required the plaintiff to keep continuous lookout to his rear, if necessary, to discover an approaching vehicle. The evidence did not warrant such instruction.

XI. Requested instruction 27 required the plaintiff to use the left side of the highway as the safest place on the highway to travel. Such an instruction was not applicable under the negligence charged, and under the facts shown by the evidence, for the reasons set out in Division V hereof. The in-

struction further assumes that the car of defendant was at all times in sight of the plaintiff, and it is contrary to the facts as the jury may have found them to be, as also noted in Division V of this opinion.

XII. Requested instructions 30 and 31 were merely definitions of and elaborations upon the term "proximate cause." The subject matter was fully covered in the court's instructions.

XIII. Requested instructions 1, 2, and 3 referred to the statutory provisions as to the use of the automobile and the purpose of such use. This matter was fully covered in the court's instructions.

XIV. Requested instructions 3 and 10 were rightly refused in that they left it to the defendant's discretion to determine whether he should have sounded his horn. The measure of his care was not his personal belief or what he thought should be done but what an ordinarily careful and prudent person would have done under the circumstances.

XV. Requested instructions 4, 5, and 6 required the jury to return a verdict for defendant if they found his negligence in failing to sound his horn, and its proximate connection, were matters of guess, conjecture, or possibility. There was no basis for such instructions in the record. Furthermore, the court fully instructed the jury on the matters to be considered by them, and upon proximate cause, the weight of the evidence, and credibility of the witnesses. There was no error in refusing the requests.

XVI. Requested instructions 6, 13, 14, 17, 18, 20, and 21 were largely repetitions of requests already commented on, and such of them or parts thereof as were proper were sufficiently covered by the court's instructions and there was no error in not giving them in the form asked.

XVII. Assignments of error 25, 26, and 27 are complaints that the verdict is not sustained by the law and the evidence and is the result of passion and prejudice and that the instructions generally are confusing and insufficient. These assignments are without merit.

XVIII. In the eighth error assigned defendant complains

of the court's refusal to give his requested instruction 29. This request set out section 5027.02 of the 1939 Code, to wit:

"Pedestrians on left. Pedestrians shall at all times when walking on or along a highway, walk on the left side of such highway."

The request recited that the plaintiff was a pedestrian within the provisions of the section, and that it was unlawful for him to walk, as he was doing, on the south or right-hand side of the highway, and that his failure to obey the statute was negligence, and if the jury found such failure contributed in any manner or degree to produce his injury he could not recover, but if they found that the violation of the statute did not so contribute, it would not defeat his right to recover.

On the other appeal we did not determine whether the plaintiff came within the purview of said section, because we held that if it was conceded, arguendo, that he did, and that his violation of it was negligence, yet, under the record, such negligence in no manner or degree contributed proximately to his injury. We are still of the same opinion, as stated hereinabove, that the conceded fact that plaintiff and his cow were walking on the right-hand side of the highway had nothing whatsoever to do with his injury. But the trial court refused to give the requested instruction, or one containing its provisions, and defendant is entitled to a ruling upon the error assigned.

It is our judgment that the court committed no error in its refusal. Our reason for so holding is that, although the plaintiff, considered strictly as an individual, was a "pedestrian," within the dictionary and the statutory (section 5000.01(44), 1939 Code) definition, meaning "any person afoot," yet the plaintiff, leading his cow along the highway, was not a "pedestrian" within the wording, meaning, or legislative intendment of the statute. The plaintiff leading his cow along the highway was within neither the letter nor the spirit of the enactment. We have several reasons for that conclusion. First, "a person afoot" may, and often does, lawfully drive a herd of hogs, sheep, goats, geese, cows, horses, mules, burros, or other livestock upon and along a highway.

He probably would have great difficulty in keeping either himself or the livestock on the left-hand side of the highway if he made much progress. Such a person could, and often does, lead or drive any one or two or three of any of such animals along a highway. If he led, instead of drove, he would have less difficulty in keeping on the left-hand side. Many times farmers, and less often others, on foot, drive horses harnessed, but not drawing vehicles or farm implements, single or double or perhaps in greater numbers. It is a common thing, particularly if his cultivated fields lie along one or both sides of a road, for a farmer to unhitch his horses from the implement he may be using in the field, and walk the team home along the highway at noon and at suppertime to feed himself and his horses, and then return to his work the same way.

Before the enactment of said statute, this court, in one or more decisions—Kessel v. Hunt, supra, 215 Iowa 117, 244 N. W. 714; Lindloff v. Duecker, supra, 217 Iowa 326, 251 N. W. 698; Taylor v. Wistey, supra, 218 Iowa 785, 254 N. W. 50; and perhaps others—said it was a matter of common knowledge that the safest place for a pedestrian to travel is near the extreme edge of the roadway on his left side, for in that place he need not watch the traffic from the rear and is facing the oncoming traffic and can step to the left on the shoulder and avoid it. But this court has never decided or intimated that the left-hand side of a highway is the safest place for a pedestrian leading or otherwise in charge of a cow or other animal. Defendant has cited no case or text so stating, and in a wide search we have found none. However, it is not always the safer or safest place for a traveler on foot. If the road is level and straight, and his vision ahead is clear for some distance, it is usually the safest place for the pedestrian. But if he is walking up against the face of a hill and cannot see or hear a motor vehicle approaching from in front, and as he nears the crest one comes over the top as suddenly and speedily as they often do, he must of necessity be real sprightly if he jumps either way and escapes. That would be the Wistey case, supra, in reverse, and the casualty would probably be the same. There is no mandatory statutory pro-

vision that such a motorist sound a warning horn. If a woman is wheeling her baby in its cab over the hill to visit a neighbor —probably she would be classed as a pedestrian under the statute—she will find the right-hand side of the road the safer, for there she will meet only pedestrian traffic and she can see and be seen by traffic operators approaching from the rear. The statute in question does not say what either the pedestrian or the oncoming operator shall do when they meet. Neither has a statutory right of way over the other. As said in South Hill Motor Co. v. Gordon, 172 Va. 193, 203, 200 S. E. 637, 642—which state at the time had a statute similar to the one involved herein:

"Neither the pedestrian nor the operator of a vehicle, in traveling along the portion of the highway prescribed for the use of each of them has a 'right of way' thereon over the other, except as expressly provided by statute. The mere right to travel on a specified portion of a highway is not to be confused with a 'right of way' thereon superior to the rights of others also entitled to use the highway. The right to the use is an equal and coordinate right."

For an interesting discussion of right of way, see dissenting opinion in Nichols v. Havlat, 142 Neb. 534, 7 N. W. 2d 84, 88. The state of Washington has a similar statute (Remington's Rev. St., 1937, section 6360–101) which requires the pedestrian to step to his left and clear of the roadway. The New York statute, McKinney's Consolidated Laws of New York, Book 62–A, Vehicle and Traffic Law, 1941, section 85(6), effective July 1, 1938, has a similar provision. The Illinois statute has a like provision, Illinois Revised St., 1945, Chapter 95½, section 175. So also has the Wisconsin statute (section 85.44(6), St. 1927 [1945]). The Minnesota statute L. 1937, chapter 464, section 57, Mason (Minn.) St., 1940 Supp., section 2720–207, provides: "Pedestrians when walking along a roadway shall walk near the left side of the roadway, *giving way to oncoming traffic.*" (Italics ours.) In the hypothetical situation we have suggested, an unencumbered walker might escape by jumping to his left, but a person leading a cow or

other domestic animal, or driving one, or driving a harnessed but unhitched horse or team, would very likely be unsuccessful in getting the frightened animal or animals to jump with him. The result would probably be a catastrophe for all concerned. We doubt very much that the legislatures of the states mentioned intended such statutory provisions to apply to persons on foot in charge of horses, cows, and other livestock herein mentioned, upon the highways.

In some of the states that have enacted legislation of this kind it is provided that pedestrians shall not walk on the highways unless there is no paralleling sidewalk. The Tennessee statute (section 2687(d), Williams Tennessee Code, Annotated, 1934) provides: "Pedestrians shall not use the highway, *other than the sidewalks thereof, for traffic, except when obliged to do so by the absence of sidewalks, reasonable, suitable, and passable for their use,* in which case they shall keep as near as reasonably possible to the extreme left side or edge of same." (Italics ours.)

The Washington statute which we have already referred to, section 6360–101, Remington's Rev. St., 1937, provides: "Pedestrians—Use of sidewalks or left side only. Pedestrians on any public highway *where a sidewalk is provided shall proceed upon such sidewalk.* Pedestrians on any public highway *where no sidewalk is provided* shall proceed on the extreme left-hand side of the roadway * * * ." (Italics ours.) The Virginia statute, section 2154(126), subdivision (f), of the Virginia Motor Vehicle Code, 1936, is identical with the Tennessee statute, supra. The Ohio statute, section 6310–34, General Code, provides: "Where crosswalks or cinder paths parallel the public road or highway pedestrians shall not walk in, along or upon the vehicular traveled portion of such public road * * * ." In Mursky v. Brody, 13 N. J. Misc. 725, 727, 181 A. 273, 274, in affirming a judgment for plaintiff injured while walking on the right-hand side of a roadway, the court said:

"It is true that *where there are no sidewalks,* pedestrians are prohibited from walking on the right-hand side of the roadway, but are enjoined to walk on the left side

facing approaching vehicular traffic. Pamph. L. 1930, ch. 230; Cum. Supp. Comp. Stat. 1930, p. 1541, §179–715R(503)."

The statutory provisions above noted permitting pedestrians to walk upon the highways commonly used for vehicular traffic only in the absence of paralleling sidewalks seem to this court to have a very definite connotation and significance. The purpose and intention implicit in such provisions is that the "pedestrians" who may walk upon the highways are those "pedestrians," and those only, who are permitted to walk upon sidewalks. Necessarily the "pedestrians" required by the statute to walk on the left side of the highway do not include persons afoot who are leading, or are otherwise in charge of, cows, horses, et al., for such persons with their charges are not permitted on sidewalks.

In Pennsylvania there is no statute or state regulation requiring pedestrians to use the left side of highways. But in King v. Brillhart, 271 Pa. 301, 304, 114 A. 515, 516, plaintiff and his companion were walking along the right edge of a paved highway when run down by defendant's car, in daylight, in plain sight, without warning. In reversing a nonsuit, the court said:

"There was no sidewalk and, in its absence, pedestrians' rights upon the paved roadway are equal to those of vehicles."

The rule was followed in Gilbert v. Stipa, 157 Pa. Super. 1, 41 A. 2d 284, 285. The plain import is that a "pedestrian" who uses a highway is the kind of "pedestrian" who uses a sidewalk. And a person on foot in charge of cow, horse, or kindred animal, whether by leading or otherwise, is not within the term "pedestrian" as used by the legislative bodies in enacting statutes of the kind under discussion. States other than those already mentioned which have statutes or highway-commission ordinances or regulations requiring pedestrians to walk on the left side of highway are: Louisiana (section 5216(d) Darts Louisiana Gen. St., Annotated, 1939); Mississippi (section 5574, Mississippi Code, Annotated, 1930, repealed by Mississippi Legislature of 1938 by Senate Bill 132, chapter 200); California (section 564 enacted in 1935, Deering's

California Codes (Vehicle), 1938–44, based on Stats. 1923, chapter 266, section 150½, added by Stats. 1929, chapter 253, section 66); Oregon (section 115-344, Oregon Compiled Laws, Annotated, 1940, Vol. 8, based on L. 1931, chapter 360, section 41a; O. C. 1935 Supp., section 55–2318); North Carolina . (State Highway Ordinances 29 and 30 as authorized by Public Laws of 1923, chapter 160) [General St. N. C., 1943, section 20–174(d)]; Arkansas (State Highway Commission Rules, section 68, held void in Snow v. Riggs, 172 Ark. 835, 290 S. W. 591). There may be other states.

So far as our research has disclosed, no court, by dictum or decision, has ever said, and no text writer, commentator, or annotator has ever interpreted, that these statutes include a person on foot, leading, or otherwise in charge of, one or more cows, horses, mules, hogs, sheep, etc., on the highway.

Defendant claims support for his contention in Sertic v. McCullough, 155 Or. 216, 63 P. 2d 884; Raths v. Sherwood, 195 Minn. 225, 262 N. W. 563; Benson v. Anderson, 129 Wash. 19, 223 P. 1063; Leopold v. Williams, 54 Ohio App. 540, 8 N. E. 2d 476; Eichinger v. Krouse, 105 N. J. Law 402, 144 A. 638; Gallardo v. Luke, 33 Cal. App. 2d 230, 91 P. 2d 211; Flaumer v. Samuels, 4 Wash. 2d 609, 104 P. 2d 484; Sprung v. Du Pont de Nemours & Co., Ohio App., 34 N. E. 2d 41; Tedla v. Ellman, 280 N. Y. 124, 19 N. E. 2d 987; Kneppe v. Huismann, 223 Iowa 569, 272 N. W. 602; Wojtowicz v. Belden, 211 Minn. 461, 1 N. W. 2d 409; Hutcheson v. Misenheimer, 169 Va. 511, 194 S. E. 665; Donaho v. Large, 25 Tenn. App. 433, 158 S. W. 2d 447; Nicholas v. Minnesota Milk Co., 212 Minn. 333, 4 N. W. 2d 84; Olson v. Duluth, M. & I. R. Co., 213 Minn. 106, 5 N. W. 2d 492. Not one of them gives any support to defendant's contention that 1939 Code section 5027.02 applied to plaintiff. We cannot further extend this opinion by a separate discussion of them.

■ Another reason why plaintiff was not violating section 5027.02 of the 1939 Code clearly appears from other provisions in chapter 251.1, entitled "Motor Vehicles and Law of Road," of which it is a part. Section 5000.01(44) of said chapter states that a " 'Pedestrian' means any person afoot." We

must assume that it has the same meaning and refers to the same kind of travelers wherever the word is used in the chapter, unless otherwise stated. We find no such statement. Section 5000.01(48) of said chapter and Code states: " 'Sidewalk' means that portion of a street between the curb lines, or the lateral lines of a roadway, and the adjacent property lines *intended for the use of pedestrians.*" (Italics ours.) Section 5000.01(52) thereof defines "a crosswalk" as "Any portion of a roadway distinctly indicated for *pedestrian crossing* by lines or other markings on the surface." (Italics ours.) The word "pedestrian" cannot mean one thing in section 5027.02 and something else in sections 5000.01(48) and 5000.01(52) and in other sections in the chapter. It is not necessary to say just who may be considered a pedestrian for the purposes of sections 5000.01(48) and 5000.01(52), but certainly we can say the legislature never intended that "crosswalks" and "sidewalks" should be places of use and travel for pedestrians or persons afoot, leading, or in charge of, cows, horses, mules, hogs, sheep, etc., thereon. It is just as clear that if such pedestrians so in charge are not within the meaning of the word and the intention of the legislature with respect to sections 5000.01(48) and 5000.01(52) they are not within the meaning of the word and the intention of the legislature with respect to section 5027.02.

Defendant has offered no precedent, authority, or sound reason that plaintiff was violating the latter section at the time of his injury.

XIX. The ninth assigned error is the giving of instruction 11 by the court. This is the instruction:

"The highways of this state are for the use of the public. Both the defendant and plaintiff had a right to use the highway in question at the time and place involved in this case. That is, *plaintiff had a right to lead his cow at the place where he was leading her at the time of the accident,* and defendant had a right to pass the plaintiff where he did, but each was required to use the highway with due respect to the rights of the other, and each had a right to assume that the other would

observe the law governing the use of highways at the time and place involved in this case.''

Defendant's complaint is because of the italicized words. There is no merit in the assignment of error. Whether the plaintiff was rightfully or wrongfully in the place where he was, was a matter of no consequence. The important fact was whether his being on the right side of the road had any causal connection or relation to his injury. In short, Was it a proximate cause thereof? This was a fact question for the jury's determination. The instruction was not erroneous. The plaintiff did have a right to be where he was. We have held in the division just preceding that he was not required as a matter of law to be on the left edge of the highway. Under the common law and under chapter 251.1, of the 1939 Code, the plaintiff had a right to lead his cow eastward at some place in the width of the highway. Section 5000.01(60) of that Code provides:

'' 'Traffic' means pedestrians, ridden or herded animals, vehicles, streetcars, and other conveyances either singly or together while using any highway for purposes of travel.''

Section 5023.04 provides:

''The person operating a motor vehicle or motorcycle shall have the same under control and shall reduce the speed to a reasonable and proper rate: 1. When approaching and passing a person walking in the traveled portion of the public highway. 2. *When approaching and passing an animal which is being led, ridden, or driven upon a public highway.*'' (Italics ours.)

Section 5017.07 provides:

''Every person riding a bicycle or an animal or driving any animal drawing a vehicle upon a roadway shall be subject to the provisions of this chapter applicable to the driver of a vehicle, except those provisions of this chapter which by their nature can have no application.''

Section 5024.01 provides:

"The operator of a motor vehicle, in cities and towns, shall at all times travel on the right-hand side of the center of the street."

Section 5024.02 provides:

"Meeting and turning to right. Persons on horseback, or in vehicles,, including motor vehicles, meeting each other on the public highway, shall give one-half of the traveled way thereof by turning to the right."

Section 5000.01(61) provides:

·" 'Right-of-way' means the privilege of the immediate use of the highway."

Chapter 251.1 does not provide where in a highway, or on which side thereof, a cow may be led, or one or more than one cow may be driven. While the "rules of the road" and the "law of the road," which are a part of the great body of the common law, have to a considerable extent been made statutory in Iowa, and in perhaps all of the states, that part thereof which has not been so enacted nevertheless is in force as a part of the common law of this state. As said in Babbitt, Motor Vehicle Law, Fourth Ed., 371, section 537:

"Requirements of statute are in addition to common-law duty of care. It is a general rule that the common-law duty of due care always rests on drivers of automobiles irrespective of statute, and that the requirements of the statute are cumulative and do not destroy this common-law duty."

See Consolidated Coach Corp. v. Sphar, 226 Ky. 30, 10 S. W. 2d 482; Tedla v. Ellman, supra, 280 N. Y. 124, 19 N. E. 2d 987; Barnes & Brother v. Eastin, 190 Ky. 392, 227 S. W. 578.

On the first appeal of this case we held that, "The appellant and the appellee had equal rights upon the highway. The rights and duties. of appellant leading his cow and of the appellee driving his automobile were reciprocal." Lawson v. Fordyce, supra, 234 Iowa 632, 637, 12 N. W. 2d 301, 304, with citations. That is the law generally. In Bombard v.

Newton, 94 Vt. 354, 356, 111 A. 510, 511, 11 A. L. R. 1402, the court said:

"The plaintiff had as good a right to drive his cows along, the highway as the defendant had to drive his automobile over it. Robinson v. Flint, etc., R. Co., 79 Mich. 323, 44 N. W. 779, 19 A. S. R. 174; Smith v. Matteson, 41 Hun 216. The parties had equal and reciprocal rights to the use of the road, and each owed the other the duty of so exercising his own right as not to interfere with that of the other. Aiken v. Metcalf, 90 Vt. 196, 97 Atl. 669."

In Bombard v. Newton, supra, the attendant was driving two gentle cows along the right-hand side of the road. They were not roped or haltered. The attendant had his hand upon the back of one. The car coming from behind frightened one cow and she jumped in front of the car and was killed. To the complaint that the attendant did not get the cows out of the way, the court said, at page 358 of 94 Vt., page 512 of 111 A.:

"The law did not require him to. He was rightfully there, and had a right to assume that the driver of the car would give him his share of the road."

In Riepe v. Elting, 89 Iowa 82, 86, 56 N. W. 285, 286, 26 L. R. A. 769, 48 Am. St. Rep. 356, the court, in discussing the "law of the road," said:

"In the sections of 2 Shearman & Redfield on Negligence cited it is said that, 'it is the universal custom in America for travelers, vehicles, and animals under the charge of man to take the right hand of the road when meeting each other, if it is reasonably practicable to do so * * * .' "

In 3 Blashfield Cyclopedia of Automobile Law and Practice, Perm. Ed., 4, 5, section 1612, it is said:

"A driver of cows and a driver of an automobile have reciprocal rights to the use of the road; each of the parties owing to the other the duty of exercising his right so as not to interfere with the rights of the other." See, also, 3 Blash-

field, 15, section 1622; Anderson v. Dail, 224 Mo. App. 403, 21 S. W. 2d 496.

In 3 Berry, Law of Automobiles, Seventh Ed., 647, section 3.463, the author states:

"Reciprocal rights and duties. Drivers of automobiles and of other vehicles and of animals have equal rights in the highways and must, aside from statute or ordinance changing the rule, use ordinary or reasonable care for the safety of themselves and of others." Citing cases.

And in 3 Berry, 697, section 3.527, it is stated:

"A drover with cattle, horses, or other domestic animals, has a right upon the public highway, and anyone operating an automobile over the same is bound to have proper regard for such traffic, as the law contemplates the public use of every public highway for any lawful purpose."

In Andrews v. Dougherty, 96 Conn. 40, 112 A. 700, 702, the cattle of plaintiff were injured by a collision with defendant's automobile. Judgment was affirmed. The court recognized the difficulty of having complete control over loose cattle and. held that one in charge should use reasonable care to keep the cattle on the right-hand side of the road, and to use more care and keep a better lookout for approaching vehicles if he was unable to do so.

The plaintiff herein had a right to lead his cow on any part of the highway not then occupied or in use by another traveler, and under the facts, which are not in dispute, he had a right to lead his cow over the course which he took from the time he left his driveway until he was knocked down by the cow on the right-hand side of the road. He was not contributorily negligent, as a matter of law, in so doing. A few of the numerous analogous cases in which like rights were upheld are: Dozier v. Woods, 190 Ala. 279, 67 So. 283, 284 (a woman on foot busy urging on a cow and calf); Powers v. Loring, 231 Mass. 458, 121 N. E. 425, 426 (a man afoot leading two horses to the right of the center of the road); Wells v. King, 219 Ky. 201, 292 S. W. 777 (plaintiff on foot

driving a hog tied with a rope); Consolidated Coach Corp. v. Sphar, supra, 226 Ky. 30, 10 S. W. 2d 482 (cattle driven along highway from one farm to another); Hubbard v. Thrasher, 26 Ala. App. 252, 157 So. 680 (deceased leading or driving a roped cow); Cusick v. Kinney, 164 Mich. 25, 128 N. W. 1089 (plaintiff leading a horse); Petrie v. Myers Co., 269 Pa. 134, 112 A. 240 (deceased was leading cow by short rope on right-hand edge of paved road); Sweeney v. Moreland Bros. Co., 227 Mich. 203, 198 N. W. 932 (pedestrian leading a cow); Hanson v. Hulet, 43 N. D. 420, 175 N. W. 205 (farmer returning from plowing, driving two harnessed horses ahead and leading three); Boos v. Field, 183 N. Y. Supp. 482, 192 App. Div. 696 (pedestrian on right-hand side leading bull).

XX. Defendant, on the first appeal, challenged plaintiff's contention that section 5034.41 under the circumstances, required the giving of a warning to plaintiff. Although the point is settled by the law of the case announced in that appeal, he reargues the matter at length on this appeal and discusses the chronological history of the legislation respecting the sounding of automobile horns. Since it is the sole ground of negligence alleged, as a matter of grace and courtesy to defendant and his able counsel, we give some further attention to the matter. The requirement in the section that an audible warning must be given when "reasonably necessary" is no more than an enactment of a common-law principle. Under the record there was warrant for finding that a proper warning should have been given had there been no such statutory provision.

As said in 4 Shearman & Redfield on Negligence, Revised Ed., 1941, section 697:

"Apart from specific legislative provision, a duty rests upon the operator of a motor vehicle to slow down and sound his horn or otherwise give timely signal of his approach when danger would otherwise be incurred. This obligation is included in the common-law duty to use reasonable care." See, also, Shifman v. Whalen, 234 N. Y. 283, 137 N. E. 331;

Fork Ridge Bus Line v. Matthews, 248 Ky. 419, 58 S. W. 2d 615.

"Even in the absence of a statute or ordinance specifically requiring a warning, a motorist nevertheless should give warning to avoid possible danger to pedestrians if the exercise of reasonable care should so require." 2 Blashfield, 385, section 1251.

In 3 Berry, Seventh Ed., 229, section 3.152, the author states:

"Reasonable care may require that a motorist give a pedestrian warning though no statute imposes the duty."

In Buchanan v. Hurd Creamery Co., 215 Iowa 415, 420, 246 N. W. 41, 44, the court said: "The conduct of one using a highway may constitute negligence, even though there has not been a violation of a statute."

The jury could fairly find that plaintiff and the cow were utterly oblivious of defendant's approach until he was at their side. The cow's sudden lunge is convincing proof that she was startled and frightened by that unwarned approach.

"Fright at the suddenly discovered approach of an automobile immediately near is something so natural and usual that one driving a vehicle should anticipate it and govern himself accordingly, where the circumstances indicate that one on the street may be taken unaware." 2 Blashfield, 382, section 1248.

"The duty of a motorist to look out for pedestrians applies, not only to those who are vigilant in observing traffic conditions, but also to pedestrians who may fail to observe every approaching car." 2 Blashfield, 389, section 1253.

"The rule of reasonable precaution which the law enjoins upon a driver of an automobile upon a public highway includes the necessity of making certain that foot-passengers are aware of the rearward approach of the vehicle * * * ." Devecchio v. Ricketts, 66 Cal. App. 334, 341, 226 P. 11, 13.

" * * * it is a matter of common knowledge that automobiles are likely to frighten horses, and their operators are charged with such knowledge, and they must exercise care

accordingly so as not to interfere with the rights of others. * * * It may not be sufficient merely to comply with all statutory requirements, but in the exercise of due care, as required by the common law, it may be his duty to take further precautions.'' 3 Berry, 681, 682, 684, section 3.516.

''If it was the automobile's sudden and close approach that caused the fright of the team, then the defendant could not escape liability because the team did not manifest fright sooner. But in such case it would be the close approach suddenly and without warning that would constitute the negligence, and not the failure to stop.'' Babbitt, Motor Vehicle Law, Fourth Ed., section 1519.

''Every person propelling an automobile upon the highway must take into consideration all the hazards attendant upon approaching animals, as the driving of domestic animals on the highway, under most circumstances, is a perfectly lawful and proper use thereof.'' 3 Blashfield, 1, section 1611.

As the author notes, this care applies more strictly to one approaching from the rear where the animal is on the side of the one approaching than as against one who approaches the animal from in front. These rules of care are as applicable to cows as to horses.

There was ample support in the record to sustain the verdict of the jury and the judgment of the court on the issue of defendant's negligence and of plaintiff's freedom from contributory negligence and we find no prejudicial error.

This case has been tried three times, two of the trials to juries resulting in verdicts for the plaintiff. In Tretter v. Chicago & G. W. Ry. Co., 154 Iowa 280, 285, 134 N. W. 626, 628, this court, under like circumstances, said of that case:

''It has been twice tried; each trial resulting in a verdict for plaintiff and an appeal by defendant. It is to the interest of the parties and of society that litigation be not unduly prolonged; and under such circumstances as are here presented the error which will justify a second reversal and third trial should be so clear as to fully demonstrate that a failure of justice will occur if this court does not again interfere. The record before us is not of that character.''

The court also said, in Blake v. City of Bedford, 170 Iowa 128, 140, 151 N. W. 74, that a judgment should not be reversed and litigation prolonged unless error is found which reasonably appears to have been prejudicial to the loser. In McKlveen v. Townley, supra, 233 Iowa 328, 7 N. W. 2d 186, and in In re Estate of Hill, 232 Iowa 1000, 1003, 6 N. W. 2d 835, we have recently reaffirmed the rule of the Tretter and the Blake cases. It will soon be six years since the plaintiff received his severe injury. The case has been tried and retried by most efficient and diligent lawyers on each side, who made the most of their opportunities. Judgment was rendered against the defendant after a full and fair trial.

XXI. Plaintiff excepted to instruction 1 because it limited the amount claimed for care and nursing to the sum of $1,589.50 and did not include interest from the date of payment. He excepted to instruction 16, which limited the amount of recovery for these items to $1,589.50 and did not authorize the allowance of interest on that item from the date of the payment of the items. Three days after the verdict was returned plaintiff filed a motion that the court compute the interest on the items of the expenditures for care and nursing and add the amount to the verdict and enter judgment therefor. This motion was denied. Plaintiff appealed from these adverse rulings. In his petition plaintiff listed twenty-three items of loss sustained for hospital, surgical and medical treatments, giving the date of each item, the payee, and the amount. The dates of these items ran from January 15, 1940, to July 21, 1941. The evidence shows the performance of these services for plaintiff, their payment by checks, presumably on the dates set out in the petition, and the reasonableness of the charges. There is no controversy about the services nor the payments. The total amount so paid was $1,589.50. The petition also alleged loss for pain and suffering in the sum of $2,000, and loss for permanent injury and loss of time in the sum of $2,000. In the prayer he demanded judgment in the sum of $5,589.50, "with interest and costs." He did not specify from what date or dates interest was to be computed. The court's first instruction gave the three items of loss and the total for

which judgment was asked. In instruction 16 the court told the jury that if they found the plaintiff entitled to recover they might allow the fair and reasonable cost of his expense not to exceed $1,589.50, permanent injury not to exceed $2,000, and for pain and suffering such amount as would reasonably compensate him therefor, and in no event to allow a total verdict in excess of $5,589.50. No instruction was given as to interest. The verdict of the jury was for $5,000, showing that $589.50 was taken from one or more of the three items of loss claimed. Plaintiff argues that since there was no controversy as to the contracting and the payment of the services it should be presumed that the total amount of $1,589.50 was allowed by the jury therefor. He also argues that since the amount of each item of the total $1,589.50 was fixed and determined and was paid by plaintiff at definite times, and he lost the use of the money so paid from the respective times of payment, he should be compensated for this loss of use by an allowance of interest to him. This last proposition which he urges is an interesting one but we do not pass upon it. The first hurdle he has is to establish how much the jury allowed on this claim of $1,589.50, because interest on the items for pain and suffering and permanent injury would run only from the date of judgment. Jacobson v. United States Gypsum Co., supra, 150 Iowa 330, 336, 340, 130 N. W. 122; Carter v. Marshall Oil Co., 185 Iowa 416, 421, 422, 170 N. W. 798. It may be reasonable to conjecture that the jury allowed the full $1,589.50, but it is only a conjecture, and it furnishes no basis for an accurate computation of interest.

The judgment is therefore—Affirmed on both appeals.

HALE, OLIVER, WENNERSTRUM, GARFIELD, SMITH, and MULRONEY, JJ., concur.